[Civ. No. 14886.  First Dist., Div. One.  May 29, 1952.]

In re Removal of Remains of ARTHUR MARTIN TERRA
et al., Deceased.  JOHN J. MITTY as Roman Catholic Archbishop, etc., et al., Appellants, v. AMELIA
OLIVEIRA, Respondent.

Andrew F. Burke for Appellants.

Buckley & Ehlers for Respondent.

WOOD (Fred B.), J.—John J. Mitty, Roman Catholic Archbishop of San Francisco, and The Roman Catholic Archbishop of San Francisco, a corporation sole, have appealed from an order of the superior court permitting the petitioner, Amelia Oliveira, to remove the remains of Arthur Martin Terra, Joseph Oliveira, and Frank Martin Terra from St. Mary's Cemetery, a Roman Catholic cemetery in Oakland, California.

This order was made in a proceeding under sections 7500-7528 of the Health and Safety Code for the disinterment of the bodies, "based upon a breach of contract for the perpetual care" of the graves, as stated by the respondent. The proposed disinterment was for the purpose of cremating the bodies and placing the ashes in a columbarium. Respondent had obtained the necessary permits from the local registrar of vital statistics, as required by sections 7500 and 7501 of the Health and Safety Code, but the cemetery au-

thorities (appellants herein) withheld their consent to such removal. Amelia is the surviving spouse of Joseph and the sole surviving parent of Arthur and Frank, neither of whom left a surviving spouse or child.

Of the decedents, Arthur died and was buried in this cemetery in May 1927; Joseph, in January 1939; Frank, in February 1944. They were buried in a plot which Amelia and Frank selected and purchased upon the occasion of Arthur's death. The court found that Amelia has been and is the owner of the right of interment in that plot to the year 2200, "but only in accordance with and subject to the canon law of the Roman Catholic Church, and the rules and regulations established by the Roman Catholic Archbishop of San Francisco for the operation of said St. Mary's cemetery, including such laws, rules and regulations which deal with the right of interment in and disinterment from cemeteries of the Roman Catholic Church, including said St. Mary's Cemetery; that in this connection, it is the fact that neither respondent nor any of his agents or employees ever called petitioner's attention to the canon law of said church, or to any of the other rules and/or regulations mentioned herein."

Amelia is a Roman Catholic and always has been. Each of the decedents was a Roman Catholic. Each was buried from a Roman Catholic Church. The interment of each was, as found by the trial court, "in accordance with the rules, regulations, discipline and rites of the Roman Catholic Church and the canon law of such Church" but "none of said rules, regulations, discipline, rites and/or canon law was called to the attention of petitioner [Amelia] by respondent [the appellants herein] or by any of its agents or employees."

The court also found that at all times mentioned in the petition or in the answer: (1) All rights of interment in cemeteries of the Roman Catholic Church, including St. Mary's Cemetery, and all rights of disinterment from any thereof, have been and are regulated by and subject to the canons of the Church; (2) the canon law of the church has prohibited cremation of the bodies of its members or communicants except in cases of great emergency and has prohibited and still prohibits removal of bodies from any such cemetery for cremation; (3) all such cemeteries are blessed pursuant to prescribed rites of the church and regarded by all Roman Catholics in good standing as consecrated ground, and the removal of the remains of a Roman Catholic buried

therein, for the purpose of cremation, is regarded as a profanation and desecration of the remains; (4) the cemeteries within the Archdiocese of San Francisco, including St. Mary's have been and are subject to certain rules and regulations prescribed by the Archbishop of the Archdiocese of San Francisco, including one which prohibits removal from such a cemetery of the body of any Catholic in good standing which has been interred therein; (5) all rights of interment have been and are subject to certain rules and regulations of the cemetery, including one which prohibits the removal of a body, interred therein, without the written consent of the Archbishop of the Archdiocese of San Francisco or the Reverend Director of the cemeteries of the Archdiocese. In this connection the court further found that "none of the provisions of the canon law of the Roman Catholic Church, nor any of the rules or regulations prescribed by the Roman Catholic Archbishop of the Archdiocese of San Francisco, nor any of the rules or regulations of St. Mary's Cemetery, which are mentioned or referred to in said paragraphs of said answer [those mentioned in clauses (1) to (5) of this paragraph], were ever called to petitioner's [respondent's] attention by respondent [the appellants] or by any of its agents or employees."

The court further found that Frank told Amelia that when he died he wanted his remains cremated and placed in a columbarium; that Frank died suddenly and Amelia was "grief stricken and under the influence of the Roman Catholic Church and by reason thereof failed to observe the wishes of . . . Frank . . . and buried his remains as aforesaid in St. Mary's Cemetery."

The court also found that Amelia paid $42.78 for the ordinary service of interment of Frank and on the date of the interment of his body the cemetery agreed with her to take perpetual care of all three of the graves for the sum of $100, which sum she paid; that the cemetery authority did not intend to give such care until it could secure sufficient men to care for the graves; that at no time did the cemetery authority notify Amelia that she would not receive perpetual care of the graves for an appreciable period of time after entering into the perpetual care contract and this information was deliberately and knowingly withheld and concealed from her; that Amelia at the time of entering into the contract believed the cemetery would immediately furnish perpetual care; that Amelia was 79 years old at the time of the

hearing (August 26, 1949), is of Portuguese descent, and reads and writes poorly; that the Archbishop and his agents are men in the best years of their lives and highly educated; that in February, 1947, the cemetery increased the number of its employees, started to complete a perpetual care program on a section to section basis over the entire cemetery but had not informed Amelia thereof or that it would not provide immediate perpetual care; that the cemetery breached the contract by allowing the graves to sink without filling them in and the graves became overgrown with weeds and grass, with an accumulation of rubbish; that moles, gophers, squirrels, and wild animals dug holes in the graves and the graves continued in that state of uncare to the date of the filing of the petition herein (July 28, 1949); that Amelia continually notified the cemetery of this condition and was continually put off with excuses, and the cemetery failed and refused during that period to care for the graves. There is evidence that the cemetery's perpetual care plan was adopted in 1941, the work to start at the main entrance and proceed, section by section, on the right of the main drive, to the rear (the graves involved in this action were at the rear), and then section by section on the left of the main drive toward the front; that this was the only practical method as distinguished from an individual lot basis, for it was necessary to remove stones and coping, level the ground, lay water pipes, and then seed the lawns and place markers to indicate the various graves; that the progress of the work was delayed because of the manpower shortage during the war; that when the petition herein was filed the work had proceeded to within 25 feet of the Terra and Oliveira graves; that during the hearing of the petition herein these graves were graded and a sprinkler system installed, and the cemetery was about ready to seed this plot.

From these facts, the trial court concluded: (1) Amelia never agreed to the rules and regulations restricting the removal of the remains from the cemetery; (2) the appellant corporation breached its contract of perpetual care and failed to obey the requirements of sections 8730 and 8736 of the Health and Safety Code; (3) appellants are estopped to set up any rule of law or contract preventing Amelia from removing the remains; (4) to enforce those rules and regulations would create a hardship.

These legal conclusions reflect consideration only of the interests and rights of the surviving relative and of the

cemetery authority, viewed in the light of a contractual relationship between them. They do not suggest that consideration was given other factors, including the interest of the public. The statute, it is true, mentions only the surviving relatives and the cemetery authority, and then says if the consent of either of them be withheld the "permission of the superior court . . . is sufficient." (Health & Saf. Code, § 7526.) It is silent concerning the factors which should move the superior court to grant its permission.

The interpretation of a similar, earlier statute of New York is persuasive of the interpretation which should be accorded our statute in this regard. Our statute was first enacted in 1931, as a part of the General Cemetery Act of that year, a comprehensive revision of our laws concerning cemeteries and related topics. (Stats. 1931, ch. 1148, p. 2434, § 24 at p. 2447.) The New York statute was enacted in 1895. Construing and applying this statute in 1908, a New York court held that among the grounds upon which a court should act in granting its permission are "those upon which courts of equity would heretofore have allowed the disinterment and reburial of human remains." (*In re Ackermann* (1908), 124 App.Div. 684 [109 N.Y.S. 228, 229].)

Those grounds, the factors which a court of equity should take into consideration in such a case, we find well expressed in *Klahr* v. *Nadel* (1937), 166 Misc. 288 [1 N.Y.S.2d 733]: "The interest of the public, the conventions of common decency, the wish of the decedent expressed in his or her lifetime, and frequently, as we have here, the prohibitions of religious law, require attention. Judicial examination of the problem has resulted in the rule that, unless reasons of substance exist or a rare emergency arises, the repose of the dead should not be disturbed. *In re Donn,* Sup., 14 N.Y.S. 189. In discussing this subject the Court of Appeals (*Yome* v. *Gorman,* 242 N.Y. 395, 403, 152 N.E. 126, 129, 47 A.L.R. 1165) expressed the principle of law in the following language: 'Only some rare emergency could move a court of equity to take a body from its grave in consecrated ground. . . . The dead are to rest where they have been laid unless reason of substance is brought forward for disturbing their repose.' The Appellate Division, *In re Ackermann,* 124 App.Div. 684, 685, 109 N.Y.S. 228, 229, expressed this doctrine: 'Many circumstances arise from time to time necessitating a disturbance of the repose of the dead, but it must be some controlling public reason or superior private right which should induce the court

458

to permit that to be done which from time immemorial has been considered abstractly as a work of desecration.' " (P. 734.)

Essentially the same principles were enunciated recently in a proceeding in equity in this state for the removal of the cremated remains of a deceased person: "It may be gathered from the cases that, while the courts have announced certain general principles governing the right to remove the bodies of the dead to new places of interment, 'Each case must be considered in equity on its own merits, having due regard to the interests of the public, the wishes of the decedent, the rights and feelings of those entitled to be heard by reason of relationship or association, the rights and principles of the religious body or other institution which granted the right to inter the body at the first place of burial, and determining whether consent was given to the burial in the first place of interment.' (15 Am.Jur. 844, quoted in *Cordts* v. *Cordts,* 154 Kan. 354 [118 P.2d 556, 558].) The court in that case adds: 'Not all of the authorities give the same order to the factors to be considered, and speaking generally, perhaps primary importance is given to the wishes of the deceased. With respect to reinterment, it has been said the same rules apply as to the original interment, but with a presumption against removal growing stronger with remoteness of connection with the decedent and reserving always the right of the court to require reasonable cause to be shown for it.' [Citations.]" (*In re Keck,* 75 Cal.App.2d 846, 851 [171 P.2d 933].)

In the light of these principles let us consider, first, the factors in this case which bear upon the question whether or not a court should grant its permission for the removal of the remains of Arthur and Joseph from consecrated ground and the cremation of those remains. Arthur and Joseph lived and died members of a church whose tenets placed great emphasis upon the importance of burial of its members in consecrated ground and proscribed the cremation of their remains. ██ There is a presumption, from the very fact of their membership in that church, that Arthur and Joseph subscribed to those tenets and desired to be buried in compliance therewith. The record discloses not the slightest evidence that they were unaware of those tenets or ever harbored a desire to be buried in other than consecrated ground or to have their remains cremated. In conformity with those tenets they were buried in consecrated ground. Now, after 22 years

in the case of Arthur and 10 years in the case of Joseph, the surviving parent and wife (who took an active part in arranging for their burial in full accordance with the tenets of their church of which she herself has always been a member, and presumably in compliance with their desire) seeks to remove their remains for the purpose of cremation. ■ The church, which controls this cemetery, withholds its consent. That withholding is neither whimsical nor unreasonable, we think, in view of the very tenets we have mentioned and the presumed wishes of the decedents. What reasons does she give why a court of equity should intervene and give its permission? She says she was not informed of these canons of the church which proscribe burial of the faithful in other than hallowed ground and forbid the cremation of their remains. That is hardly a reason. It does not appear that she would have buried them differently or that she would have cremated their bodies had she known of those restrictions or that she intended these burials as other than permanent in character. Moreover, we do not think she can plead ignorance of those doctrines of her church. Her very membership tokens subscription to them. ■ From the act of joining a voluntary society there is implied an agreement to abide by the society's rules and regulations, to the extent at least that they are not in contravention of law or against public policy. "When a person joins an organized society, such as a church or congregation associated for religious worship, under the supervision and control of higher church courts, he necessarily by that act agrees to abide by its rules of government and the judgments of its courts regularly made, and consents that all his rights, privileges and duties as a member, or in respect to his membership, shall be governed and controlled by those rules and judgments. This agreement is always implied from the fact of membership." (*Permanent Committee of Missions* v. *Pacific Synod*, 157 Cal. 105, 122 [106 P. 395]. See, also, *Linke* v. *Church of Jesus Christ*, 71 Cal.App.2d 667, 668-669 [163 P.2d 44].) Then, too, Amelia's asserted ignorance of the significant tenets of her church cannot be ascribed to Arthur and Joseph, as if they were likewise ignorant, to defeat the presumption that their remains have lain in hallowed ground these many years in accordance with their devout hopes and desires.

■ The only other reason which she gives is the asserted breach of a perpetual care contract which she executed with the cemetery authority. Arthur and Joseph had no part in

the negotiation of that contract which took place in 1944, years after their burial. Nor was it any part of the arrangements which she made for their burial. It was a completely separate and independent transaction. The performance, the breach, the enforcement, or the rescission. of that contract, has no compelling, persuasive, or proper bearing upon the question whether or not a court of equity should consent to removal and cremation contrary to the presumed desires and in desecration of the memory of Arthur and Joseph, and in contravention of the canon law and tenets of their church in accordance with which their remains were buried. We find no sufficient reason for a court to grant permission for the removal and cremation of the remains of Arthur and Joseph.

In relation to Frank's remains, we have an additional statute to consider.* Section 7980 of the Health and Safety Code as enacted in 1939 declared and still declares that "The heirs, relatives or friends of any decedent whose remains have been interred in any cemetery owned, governed or controlled by any religious corporation or by any church or religious society of any denomination or by any corporation sole administering temporalities of any religious denomination, society or church, or owned, governed or controlled by any person or persons as trustee or trustees for any religious denomination, society or church shall not disinter, remove, reinter or dispose of any such remains except in accordance with the rules, regulations and discipline of such religious denomination, society or church. . . ." (Stats. 1939, ch. 60, p. 482, at p. 695.) This provision appears in the same part of the same division (part 2 of division 7) of the code as do sections 7525-7528 which authorize the instant proceeding. This provision was derived from section 17 of chapter 312 of the statutes of 1923, a statute which provided for the abandonment of cemeteries and the removal of remains. It accorded the relatives an opportunity to attend to the removal, and then stated in section 17 that "Nothing in this act contained shall authorize or permit . . . the heirs, relatives or friends of any person whose body has been interred in any cemetery owned, governed or controlled by any religious corporation or by any church or religious society . . . or by any corporation sole administering temporalities of any religious denomination, . . . to disinter, remove, re-

---

*The additional statute, section 7980 of the Health and Safety Code, may or may not apply to the proposed removal of the remains of Arthur and Joseph. We express no opinion on that question.

inter or dispose of any such body except in accordance with the rules, regulations and discipline of such religious denomination, society or church." (Stats. 1923, ch. 312, p. 646, § 17 at p. 656.) In that form it, of course, applied only to the subject matter of the 1923 statute, removal of remains upon the abandonment of a cemetery.

In 1931 this 1923 statute was made a part of the General Cemetery Act. This was done by way of incorporation by reference, concluding with these words: "and said act as amended is hereby approved, adopted and enacted as section 28 of this act, as fully as if copied herein." (Stats. 1931, ch. 1148, p. 2434, § 28 at pp. 2448-2449.) ▮ In this form, it literally applied to everything in the General Cemetery Act, including the provisions of section 24 thereof which in 1939 were carried into sections 7525-7528 of the code without substantial change. In such a case, they carry with them the scope and meaning they had before. (See *Southern Calif. Jockey Club, Inc.* v. *California Horse Racing Board,* 36 Cal.2d 167, 173 [223 P.2d 1]; *Sandstrom* v. *California Horse Racing Board,* 31 Cal.2d 401, 413 [189 P.2d 17, 3 A.L.R. 90]; and *Sobey* v. *Molony,* 40 Cal.App.2d 381 [104 P.2d 868].) The first draft of this portion of the proposed Health and Safety Code, which the Code Commission distributed for comment and criticism, limited the provisions of section 7980 to the chapter which dealt with the abandonment of a cemetery and removal of remains when ordered by a city or city and county. Appended was a note stating that the "Expression 'nothing authorizes' is ambiguous, and perhaps meaningless. If prohibition is intended it should be definite. There seems to be no prohibition elsewhere against removing bodies upon permit from civil authorities without regard to religious observances." The text of the final draft of section 7980, distributed by the Code Commission for further comment and criticism, was the same as that in which it was later enacted into law. It would appear, therefore, that the portion of section 7980 which we have quoted represents an interpretation and restatement of that portion of section 28 of the Act of 1931 which incorporated therein the provisions of section 17 of chapter 312 of 1923 and thus applies to a proceeding under sections 7525-7528. ▮ When a burial has been made in a religious cemetery as described in section 7980, that section gives preference to the rules, regulations and discipline of the church over the desires of the relatives of the decedent, in this case the desires of Amelia. There might be circum-

stances under which the statute does not accord that preference. Nor would the statute necessarily prevent a court from authorizing a removal in case of some emergency or other controlling public reason. The question is whether there is any such circumstance in this case. We have found none. Whatever Amelia's rights may have been to have effected a different arrangement for the original disposition of Frank's remains, the fact is that she had him buried in full compliance with the canons, rules and regulations of his and her church. Whatever bearing her lack of awareness of the restrictions upon removal might have upon her contractual relationship stemming from the purchase of the burial plot or the execution of the perpetual care contract, does not obtain in respect to her relationship to the church as a member. She dealt with the representatives of the church in that capacity. She was bound, as we have seen, by those canons, rules and regulations by the very act of becoming and being a member of the church. The finding that she acted while grief stricken and "under the influence of the . . . church" is based upon her testimony that "because of his [Frank's] sudden death—he died from heart failure—and my grief, and because of the Priests I buried him in St. Mary's Cemetery. I made a mistake." That does not indicate that any undue influence was exerted or that the representative of the church acted in the belief that the funeral and burial planned and actually carried out were not in full conformity with the desires of Amelia and Frank as members of the church. Had she promptly made her "mistake" known to the authorities of the church we might have a circumstance to consider. But she did not do so. She made that known only after some five years when she became dissatisfied with the failure of the cemetery authority to care for the three graves. These facts do not indicate that a situation exists which renders the statutory preference inapplicable as between the surviving relative and the cemetery authority. Nor does the perpetual care contract and its delayed performance (which the trial court, upon supporting evidence, found has been breached) render the statutory preference inapplicable. The making of that contract was independent of and separate from the conduct of the funeral ceremonies for Frank and the burial of his remains. It appears that Amelia had arranged for those ceremonies and that burial, when a man from the funeral parlor came and told her that if she paid $100 in addition to the burial the cemetery would take care of the graves.

That transaction, though closer in point of time, had no closer factual or legal connection with the burial and right of removal of Frank's remains than it had in the case of Arthur or Joseph.

There is this difference: Frank had orally expressed a desire that his remains be cremated. That, of course, was a desire for cremation upon his decease, not after a permanent burial and the lapse of several years. That desire cannot now be literally fulfilled. Permanent sepulture was effected by the person to whom he expressed that desire, in a plot which in 1927 he assisted her to select, in a cemetery of his faith. The church and cemetery authorities were not informed of his desire for cremation or of any facts indicating that this proposal for removal might later be made. Accordingly, they effected burial in full conformity with the rules, regulations and discipline of the church. These circumstances convince us that this is a case for observance of the policy expressed in section 7980 of the code, which does not sanction removal except in conformity with the rules, regulations and discipline of the church.

The judgment is reversed with directions to the trial court to amend the findings of fact and conclusions of law and render judgment thereon in accordance with the views herein expressed.

Peters, P. J., and Bray, J., concurred.