IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 7, 2009 Session

## LINDA F. SEALS v. H & F, INC. ET AL.

**Rule 23 Certified Question of Law from the United States District Court
for the Middle District of Tennessee
No. 3:08-cv-01038     William J. Haynes, Jr., Judge**

---

**No. M2009-00330-SC-R23-CQ - Filed January 15, 2010**

---

The defendants, a funeral home and a crematory operator, arranged for and conducted a cremation at the joint request of the decedent's fiancée and his fourteen-year-old son. The decedent's mother, who claims the entitlement to have directed the disposal of his body, filed suit in the United States District Court for the Middle District of Tennessee contending wrongful cremation and seeking damages under a variety of theories in tort. Three certified questions of state law have been presented to this Court for consideration. Our responses are as follows: (1) where decedent did not make a pre-mortem election for the method of disposal of his remains, a parent has a right of control superior to that of a fiancée or minor child; (2) while a minor may be an "heir" under the safe harbor provisions for crematory operators under our statute, reliance on the instructions of a minor may qualify as so reckless as to subject the operator to liability; and (3) a funeral home that merely makes arrangements for a cremation and contracts for another party to perform the cremation is not the operator of a crematory facility for purposes of the statutory safe harbor.

### Tenn. Sup. Ct. R. 23 Certified Question of Law

GARY R. WADE, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, and SHARON G. LEE, JJ., joined. WILLIAM C. KOCH, JR., J., filed an opinion concurring in part and dissenting in part.

Robert D. MacPherson and Elizabeth Lee Luongo Youmans, Lebanon, Tennessee, for the Plaintiff, Linda F. Seals.

Alisha M. Toll, Benjamin James Miller, and Dianne M. Schwartz, Nashville, Tennessee, for the Defendant, H & F, Inc.; and James Randolph Tomkins, Nashville, Tennessee, for the Defendant, Sellars Cremation Service, Inc.

## OPINION

### Facts and Procedural History[1]

Rodney Leon Boling (the "Decedent") died on October 28, 2007. At the joint request of his fiancée[2] and his fourteen-year-old son, whose names are not a part of this limited record, the body was cremated by the defendants, H & F, Inc. ("H & F"), a funeral home operator, and Sellars Cremation Service, Inc. ("Cremation Service") (the "Defendants"). While H & F made contractual arrangements with Cremation Service for the cremation, both businesses are owned by the same individual, Judd Sellars. Linda F. Seals (the "Plaintiff"), is the Decedent's mother and his sole surviving parent.

The Plaintiff filed a diversity-of-citizenship suit in the United States District Court for the Middle District of Tennessee, arguing that she alone was entitled to control the disposition of the body pursuant to the order of priority established in Akers v. Buckner-Rush Enterprises, Inc., 270 S.W.3d 67, 73 (Tenn. Ct. App. 2007), perm. app. denied (Tenn. Apr. 7, 2008), reh'g denied (Tenn. May 12, 2008), and that the Defendants either negligently or intentionally failed to either ascertain or respect her right to do so. She is seeking damages under a variety of theories sounding in tort.

In response, both of the Defendants first claim that the fiancée and child led them to believe that the Plaintiff had not survived the Decedent, and that they were entitled to rely upon their representations. Secondly, the Defendants assert that the Decedent's minor son, rather than the Plaintiff, had the right to control the disposition of his father's remains. As an alternative defense, Cremation Service contends that even if the Plaintiff had the superior right to control the disposition of the body, Tennessee Code Annotated section 62-5-511 (2009), which establishes a safe harbor for the operator of a crematory facility, precludes liability for an operator following the instructions of an heir, unless the operator acted with malicious purpose, in bad faith, or in a wanton or reckless manner. Finally, H & F argues that it also qualifies as an operator of a crematory facility and is, therefore, also protected from liability by the terms of section 62-5-511.

The district court found that there were determinative questions of state law for which there was no precedent. Pursuant to Tennessee Supreme Court Rule 23, a certification order

---

[1] Because of the procedural posture of the case, we do not have the record. We have relied, therefore, upon the Certification Order entered by the federal district court for our summary of the relevant facts.

[2] "Girlfriend" is the term used by the Plaintiff to describe this person, while the Defendants use the term "fiancée." We take no position as to which term is more accurate and use "fiancée" only for convenience.

was filed on February 20, 2009, presenting three questions of law, each of which has been accepted by this Court for consideration:

1. Who has the legal control over the disposition of the remains of a decedent when there is no surviving spouse? Specifically, with respect to the facts of this case, with whom is such control vested among a sole surviving parent of the decedent, a fiancée of the decedent, and a fourteen-year-old minor child of the decedent?

2. If the answer to Question #1 is such that the fourteen-year-old minor has no legal control or has no superior or exclusive right of control over the disposition of the remains of his deceased parent, is such a child nonetheless an "heir" of the decedent, as that term is used in section 62-5-511, Tennessee Code Annotated, such that an operator of a crematory facility acting without malicious purpose or bad faith, and not in a wanton or reckless manner, in cremating the remains of the decedent in accordance with instructions set forth by the child is not liable for damages in a civil action for such cremation, as provided by said statute?

3. Does the defendant funeral home, H&F, Inc., fall under the definition of a crematory facility for purposes of section 62-5-511, Tennessee Code Annotated, given its role in the disposition of the decedent's remains?

**Authority, Standard of Review, and Statutory Interpretation**

Under Rule 23 of the Tennessee Supreme Court Rules, we may "accept and answer a question of state law certified . . . by the federal court to assist the federal court in deciding a question of state law." Haley v. Univ. of Tenn.-Knoxville, 188 S.W.3d 518, 521 (Tenn. 2006) (citing 17A Charles Alan Wright, Edward H. Cooper & Arthur R. Miller, Federal Practice & Procedure § 4248 (2d ed. 1988)). Although "answering a certified question is not an adjudicative function" and, in consequence, "not an exercise of this Court's jurisdiction," id. at 522, we have held that we are authorized to answer certified questions

as part of our inherent judicial power under Article VI, section 1 of the state's Constitution.[3] Id. at 523.

Rule 23 permits consideration of questions of law only, not questions of fact or controversies as a whole. Our scope of review for questions of law is de novo. Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008) (citing Perrin v. Gaylord Entm't Co., 120 S.W.3d 823, 826 (Tenn. 2003); Ganzevoort v. Russell, 949 S.W.2d 293, 296 (Tenn. 1997)); S. Constructors, Inc. v. Loudon County Bd. of Educ., 58 S.W.3d 706, 710 (Tenn. 2001). Issues of statutory construction are questions of law. Hayes v. Gibson County, 288 S.W.3d 334, 337 (Tenn. 2009).

When interpreting a statute, we "must first ascertain and then give full effect to the General Assembly's intent and purpose" in drafting those sections. Waldschmidt v. Reassure Am. Life Ins. Co., 271 S.W.3d 173, 176 (Tenn. 2008). Our chief concern is to carry out the legislature's intent without unduly broadening or restricting the statute. Houghton v. Aramark Educ. Res., Inc., 90 S.W.3d 676, 678 (Tenn. 2002) (quoting Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)). We presume that every word in a statute has meaning and purpose and should be given full effect if so doing does not violate the legislature's obvious intent. In re C.K.G., 173 S.W.3d 714, 722 (Tenn. 2005). When the statutory language is

---

[3] It is within our discretion to decline to answer certified questions. Tenn. Sup. Ct. R. 23, § 1. Nevertheless, in the interests of comity, this Court frequently accepts certified questions of law. See, e.g., Allmand v. Pavletic, 292 S.W.3d 618 (Tenn. 2009); Lincoln Gen. Ins. Co. v. Detroit Diesel Corp., 293 S.W.3d 487 (Tenn. 2009); In re Hogue, 286 S.W.3d 890 (Tenn. 2009); Shorts v. Bartholomew, 278 S.W.3d 268 (Tenn. 2009). There are concerns about overuse of the certified question process. For example, Judge Bruce M. Selya of the United States Court of Appeals for the First Circuit once opined that "neither federalism nor efficiency nor fairness sufficiently justifies the . . . popularity that certification has acquired in our system." Bruce M. Selya, Certified Madness: Ask a Silly Question . . . , 29 Suffolk U. L. Rev. 677, 691 (1995). We have not shared Judge Selya's harsh assessment of the general merits of the certification process. Haley, 188 S.W.3d at 521-23 (discussing the value of certified questions). We do believe, however, that certifying a question is not always the best option. Federal courts are, of course, permitted to decide issues of state law in cases over which they have jurisdiction, as we may decide issues of federal law in cases over which we have jurisdiction. In our system, it is commonplace for a question of law to be decided first by a court other than the court empowered to resolve the question definitively:

> [V]ery few of our legal institutions at any level ensure participants recourse to the highest possible authority, yet we do not consider them, in general, unjust or unfair. Nor should we deem it unfair simply because parties in the midst of federal court litigation are denied direct access to a state's highest court for resolution of a state-law issue.

Selya, 29 Suffolk U. L. Rev. at 691. Moreover, deciding not to certify a question at the trial level does not preclude certification later, because a question of law may be certified to this Court at any level of the federal appellate process. Tenn. Sup. Ct. R. 23, § 1.

clear and unambiguous, we simply apply its plain meaning. Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004). When a statute is ambiguous, however, we may refer to the broader statutory scheme, the history of the legislation, or other sources to discern its meaning. Colonial Pipeline, 263 S.W.3d at 836. We presume that the General Assembly was aware of its prior enactments and knew the state of the law at the time it passed the legislation. Owens, 908 S.W.2d at 926.

**Question 1**

The federal district court has asked us first to ascertain who has control over the disposition of remains when there is no surviving spouse. For the reasons set out below, we have determined that the decedent, as a general rule, has the primary entitlement to expressly elect the method of disposal of his or her body, or, in the alternative, to designate an individual to elect the method of disposal; if the decedent does not do so, however, the legal right to direct the disposal of remains descends to the following parties, in order of priority: (1) the spouse of the decedent; (2) adult children of the decedent; (3) parents of the decedent; (4) adult siblings of the decedent; (5) adult grandchildren of the decedent; (6) grandparents of the decedent; and (7) an adult who has exhibited special care and concern for the decedent. Thus, the right of a surviving parent (who would be third in priority), absent an election by the decedent to the contrary, will control over the wishes of a fiancée (seventh in priority) or minor child, to whom priority would never descend.

Before we consider the specific rights of survivors, we must raise a point that the certified question neglects. The question appears to assume – perhaps inadvertently – that the decision to cremate will always rest in the hands of either the surviving spouse or some other survivor. First and foremost, however, the decedent has the right to direct the method of disposal for his or her body. The policy of the General Assembly confers upon the individual the opportunity to make decisions of this nature. See Tenn. Code. Ann. § 68-30-104 to -108 (Supp. 2009) (empowering individuals to make anatomical gifts during life and placing restrictions upon those who might elect to revoke that gift); Tenn. Code Ann. § 62-5-511(a)(1) (providing a safe harbor for a crematory facility operator that follows "the instructions set forth by the decedent"). Our opinion today simply confirms the public policy of the state. It is only when the decedent does not make an election during the course of his or her life that the right and obligation fall upon a survivor.

Who has a right to decide the manner of disposal of a dead body – and, by extension, who has legal recourse in the event of wrongful acts – has presented a challenge to the courts since the early days of the common law. Our common law did not recognize property rights in human remains. In re Johnson's Estate, 7 N.Y.S.2d 81, 84-85 (N.Y. Surr. Ct. 1938); Pettigrew v. Pettigrew, 56 A. 878, 879 (Pa. 1904); Tanya Hernández, The Property of Death, 60 U. Pitt. L. Rev. 971, 981-82 (1999). But see Whaley v. County of Tuscola, 58 F.3d 1111,

1116 (6th Cir. 1995) (finding constitutionally protected property interest in dead body under Michigan law); Brotherton v. Cleveland, 923 F.2d 477, 482 (6th Cir. 1991) (finding constitutionally protected property interest in dead body under Ohio law). As a result, both the legislative and judicial branches of government have often relied upon claims in tort and in "quasi-property" principles to ensure that survivors have meaningful recourse in the event of the wrongful disposal of a body. Michelle Bourianoff Bray, Note, Personalizing Personalty: Toward a Property Right in Human Bodies, 69 Tex. L. Rev. 209, 225-28 (1990).

Since the ruling of this Court in Hill v. Travelers' Insurance Co., 294 S.W. 1097, 1099 (Tenn. 1927), this state has protected the interests of survivors by permitting claims in tort for emotional suffering. Cf. Eskin v. Bartee, 262 S.W.3d 727, 734 & n.18 (Tenn. 2008) (observing that Hill marked the Court's first instance of willingness to depart from "the requirement that [in order to be compensable] emotional distress must either have some physical manifestation or be accompanied by a physical injury"). In Hill, Travelers' Insurance Company, which had written a life insurance policy on the decedent, Albert Brown, had asked his wife, Mary Brown Hill, to consent to an autopsy. She refused at first, but eventually relented on the condition that the autopsy be performed in a manner designed to avoid the mutilation and public exposure of the body. Later, Mrs. Hill filed suit for damages arising out of the "unauthorized mutilation and exposure" of the remains. 294 S.W. at 1097. When the insurance company and the physician who performed the autopsy sought dismissal for failure to state a cause of action, this Court, while acknowledging that human remains are not "property in the ordinary commercial sense," held that "the right to the possession of a dead body for the purposes of decent burial is vested in the surviving husband or wife or next of kin, and that it is a right which the law will recognize and protect." Id. at 1098 (citing Larson v. Chase, 50 N.W. 238 (Minn. 1891)). Because the wife had the "right to refuse to permit an autopsy [and] the right to clothe her consent with any stipulations or limitations," she was entitled to sue for damages. Id. at 1099. Those damages were not, however, measured by "the injury done to the dead body, but . . . for the wrong or trespass on the plaintiff's right to the undisturbed possession and control of the body, measured by the mental anguish and suffering of the plaintiff occasioned thereby." Id.

Although our decision in Hill recognized the right of "the surviving husband or wife or next of kin" to control the disposition of a dead body, the Court offered no guidance how to adjudicate competing claims among family members. "The strict legal meaning of the phrase 'next of kin' is 'next or nearest in blood'" according to the common law "line of consanguinity." Sneed v. Henderson, 366 S.W.2d 758, 760 (Tenn. 1963) (quoting Helms v. Elliott, 14 S.W. 930, 931 (Tenn. 1890)). We have acknowledged, however, that sometimes the determination of the "next of kin" for a specific purpose depends not on the common law of consanguinity but on the rules governing that specific area of law. In Tudor v. South Trust Co., for example, we acknowledged that "next of kin" might refer to either the "next or

nearest in blood relationship computed according to the law of consanguinity" or the "persons entitled to the personal estate of the intestate under the statutes of distribution." 246 S.W.2d 33, 34 (Tenn. 1952) (citing Frank v. Frank, 172 S.W.2d 804 (Tenn. 1943)).

While no opinion of this Court has definitively established the order of priority among the various members of a family in the disposal of a dead body,[4] only two years ago, our Court of Appeals considered this issue in litigation arising out of particularly egregious conduct by the operator of Tri-State Crematory in Noble, Georgia:

> In 2002, it was discovered that the crematory was not operational and had not been operational in years. Although [owner T. Ray Brent] Marsh continued to accept bodies for cremation, he simply was burying or dumping the bodies on the Tri-State premises. Marsh would return to the family members what purported to be the ashes of a deceased, but the ashes were not the remains of their loved one. Over 300 un-cremated bodies were discovered on the Tri-State premises.

Akers, 270 S.W.3d at 69; see also Crawford v. J. Avery Bryan Funeral Home, Inc., 253 S.W.3d 149, 150-52 (Tenn. Ct. App. 2007) (discussing facts of Tri-State case); Floyd v. Prime Succession of Tenn., No. E2006-01085-COA-R9-CV, 2007 WL 2297810, at *1-4 (Tenn. Ct. App. Aug. 13, 2007) (same); Ariel Hart, Guilty Plea and Apology From Crematory Manager, N.Y. Times, Nov. 20, 2004, at A2 (discussing the "hundreds of bodies . . . found scattered, stacked and left to rot at the Tri-State Crematory"). In Akers, our Court of Appeals had to determine which family members had standing to make claims for the misconduct by the crematory. After concluding that no statute addressed who "had control over disposition of [a] loved one['s] body and, therefore, [had] standing to proceed with . . . tort claims," our intermediate court adopted a rule based on analogous provisions of the Revised Uniform Anatomical Gift Act (the "RUAGA"), Akers, 270 S.W.3d at 73, which was enacted in 2007. Act of May 29, 2007, ch. 428, 2007 Tenn. Pub. Acts 605 (codified at Tenn. Code Ann. §§

_____

[4] The separate opinion suggests that our holding contradicts longstanding common law embodied in the "right of sepulchre." It does not. Our research suggests that this Court has never used the term "right of sepulchre." More importantly, this Court has never considered the questions raised in this case. We disagree that Tennessee common law in this area qualifies as well settled based upon a single Court of Appeals case, Estes v. Woodlawn Memorial Park, Inc., 780 S.W.2d 759 (Tenn. Ct. App. 1989). In fact, the holding in Estes itself goes far beyond – and arguably contradicts – Hill. For example, while Hill vests the right to direct the method of disposal with "the surviving husband or wife or next of kin," Estes suggests that the "spousal right of burial may not apply when the spouses had separated and were not living together at the time of death." Moreover, the opinion in Estes relies repeatedly on holdings in other jurisdictions and statements from secondary sources – likely because Tennessee common law was silent on the principles espoused. In our view, Estes demonstrates how unsettled this area of law has been in Tennessee.

68-30-101 to -120 (Supp. 2009)); Revised Unif. Anatomical Gift Act (2006), 8A U.L.A. 33 (Supp. 2009).[5] Our Court of Appeals based its ruling on Tennessee Code Annotated section 68-30-109(a), which provides as follows:

> [A]n anatomical gift of a decedent's body or part for purpose of transplantation, therapy, research, or education may be made by any member of the following classes of persons who is reasonably available, in the order of priority listed:
> (1) A guardian or conservator of the person of the decedent at the time of death, if the court order authorizes the guardian or conservator to make healthcare decisions;
> (2) An agent; [[6]]
> (3) The spouse of the decedent;
> (4) Adult children of the decedent;
> (5) Parents of the decedent;
> (6) Adult siblings of the decedent;
> (7) Adult grandchildren of the decedent;
> (8) Grandparents of the decedent;
> (9) A surrogate identified pursuant to § 68-11-1806;
> (10) An adult who exhibited special care and concern for the decedent; and
> (11) Any other person having the authority to dispose of the decedent's body.

Our intermediate court did not, however, import the RUAGA order of priorities in its entirety, omitting several parties whose authority was of a limited, exclusively medical nature, such as surrogates and individuals with powers of attorney for healthcare. Further, the tenth category, "[a]n adult who exhibited special care and concern for the decedent," was omitted, possibly because an individual unrelated by consanguinity or marriage did not qualify as "next of kin." The order of priorities adopted in Akers was thus as follows: "(1) the spouse of the decedent; (2) adult children of the decedent; (3) parents of the decedent;

---

[5] The RUAGA replaced the Uniform Anatomical Gift Act, which had – with various revisions – governed anatomical gifts in Tennessee since 1969. Act of March 25, 1969, ch. 35, 1969 Tenn. Pub. Acts 62 (codified as amended at Tenn. Code Ann. §§ 68-30-101 to -402 (2006)); see Unif. Anatomical Gift Act (1968), 8A U.L.A. 69 n.2 (2003) (noting that, in 2001, Tennessee adopted a version of the Uniform Anatomical Gift Act that blended its 1968 and 1987 versions).

[6] An "agent" for the purposes of section 68-30-109(a)(2) is defined as either an individual "[a]uthorized to make healthcare decisions on the principal's behalf by a power of attorney for healthcare or an advance directive" or an individual "[e]xpressly authorized to make an anatomical gift on the principal's behalf by any other record signed by the principal." Tenn. Code Ann. § 68-30-102(2).

(4) adult siblings of the decedent; (5) adult grandchildren of the decedent; and (6) grandparents of the decedent." 270 S.W.3d at 73.

The Defendants reject the ruling in Akers and urge us to ignore the RUAGA and adopt the system of priorities established by statute for the purposes of descent and distribution. See Tenn. Code Ann. § 31-2-104 (2007). Unlike the RUAGA, section 31-2-104 does not govern any aspect of the disposal of a decedent's body, addressing instead the distribution of property from the decedent's estate. Tenn. Code Ann. § 31-2-101 (2007). Nevertheless, the Defendants argue that we are bound by the statutory terms because they reflect the common law of consanguinity. Although the order of priorities listed in the RUAGA and the law of intestate succession are similar, an important distinction is that the RUAGA empowers only adult children of the decedent, whereas the law of intestate succession provides for minor heirs. But see 22A Am. Jur. 2d Dead Bodies § 21 (Westlaw 2009) ("In the absence of a showing that normal parental and filial relations did not exist at the time of death, an adult child has the right to supply a proper burial for a widowed parent or a parent who was not married at the time of his or her death, and did not leave a testamentary directive concerning his or her burial." (emphasis added) (citations omitted)).

In our view, the RUAGA is the more appropriate source of guidance.[7] Unlike the law of intestate succession, the RUAGA directly addresses disposal of a dead body. Although the act applies only "to an anatomical gift or amendment to, revocation of, or refusal to make an anatomical gift," Tenn. Code Ann. § 68-30-103, and was not designed to govern all aspects of postmortem disposition, the concerns addressed by the legislation apply in equal measure to the disposal of a human body. In Pettigrew, the Pennsylvania Supreme Court identified competing concerns:

> The determination [of how to dispose of a dead body] must rest . . . "upon considerations arising partly out of the domestic relations . . . partly out of the universal sentiment . . . that the dead should repose in some spot where they

---

[7] Given the separate opinion's admonition that "[w]e are not . . . empowered to parse the Tennessee Code Annotated for other statutes that might contain a workable framework for resolving a dispute," it bears emphasizing that we are not expanding the RUAGA to cover cremation disputes. Rather, as the separate opinion concedes, we are presented with a question under the common law. As that opinion further observes, some aspects of the common law right under Hill have never been addressed directly by this Court. Under these circumstances, it is permissible to consider analogous areas of law in order to ascertain the underlying policy of the state. See Robert F. Williams, Statutes as Sources of Law Beyond their Terms in Common-Law Cases, 50 Geo. Wash. L. Rev. 554, 556 (1982) ("Indeed, courts have been influenced in many cases by statutes not applicable by their terms."). Just as we consider the RUAGA, the separate opinion considers statutes governing the law of descent to support its proposed rule and cites numerous statutes governing the rights of minors in attempting to determine the state's underlying policy in that regard.

-9-

will be secure from profanation; partly out of what is demanded by society for the preservation of the public health, morality, and decency; and partly often out of what is required by a proper respect for and observance of the wishes of the departed themselves."

56 A. at 879 (quoting Fox v. Gordon, 16 Phila. 185 (Pa. C. 1883)). The disposal of a dead body may also implicate issues of profound religious importance. See Mitty v. Oliveira, 244 P.2d 921, 924-25 (Cal. Ct. App. 1952) (describing religiously-charged controversy over method of disposal). Given the sensitive nature of this topic, we are hesitant to base our answer on an area of law crafted to govern the distribution of property from an intestate estate.

Earlier versions of Tennessee's legislation governing crematories, including Tennessee Code Annotated section 62-5-511, provide further support for the order of priorities established in Akers. Although these statutes, as now written, do not provide specific guidance as to how to resolve disputes between family members over the disposal of a human body, earlier versions did establish, for some cremation-related purposes, systems of priority similar to the system contained within the RUAGA. Tenn. Code Ann. § 62-5-503(a) (Supp. 1999); Tenn. Code Ann. § 62-5-501(b) (Supp. 1985).

Until our General Assembly provides more explicit guidance on the subject, we adopt the following order of priority as to the right to dispose of a dead body: (1) the decedent, pre-mortem, including through any party designated in writing by the decedent to make the decision post-mortem; (2) the spouse of the decedent; (3) adult children of the decedent; (4) parents of the decedent; (5) adult siblings of the decedent; (6) adult grandchildren of the decedent; (7) grandparents of the decedent; and (8) an adult who exhibited special care and concern for the decedent.[8] As to the circumstances at issue, if the Decedent did not provide written instructions to the contrary, a surviving parent would have priority over a fiancée or minor child.

## Question 2

Having concluded that a surviving parent would have rights superior to a fiancée or minor child, we now turn to the second certified question. The district court has asked whether a minor child may be an "heir" of a decedent, as that term is used in the safe harbor provision of Tennessee Code Annotated section 62-5-511. The answer is yes.

---

[8] Although we recognize the difficulty of determining who is "an adult who exhibited special care and concern for the decedent," as well as the fact that such an individual may not fit the traditional definition of "next of kin," we believe that, as a last resort, it would be preferable to empower such an individual, who would best reflect the preferences of the decedent, the friends of the decedent, and the community.

In light of our answer to Question 1, however, the inquiry should not stop there. When appropriate, we may "exercise our discretion to reframe the Rule 23 certified question before us so as to provide the guidance actually sought." Shorts, 278 S.W.3d at 280 n. 13 (citing 17A Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Vikram David Amar, Federal Practice and Procedure, Jurisdiction 3d. § 4248 n. 67 and accompanying text (Westlaw 2009)). In an effort to avoid any confusion by our response to Question 2, we will make an additional point. Although an individual's minority has no bearing on whether he or she is an "heir," minority is a critical factor in the determination of whether following the instructions of such an heir may qualify as "wanton or reckless" under section 62-5-511(a). As indicated, a minor child is not among those who will ordinarily be empowered to direct the disposal of a body; therefore, if an operator knows that a child heir is or is likely a minor, it may be reckless to follow the child heir's instructions, because the operator may not consciously disregard the rights of the individual actually empowered to make the decision. Whether the circumstances in this instance are such that reliance on a minor child's instructions would be reckless, thereby disqualifying Cremation Service from the safe harbor provision of the statute, is a question of fact for the district court.

## Background

A recitation of the legislative history provides context for the analysis of this question. In 1982, the General Assembly amended the statutes governing licensing and regulation of funeral directors and embalmers to explicitly recognize an individual's right to elect to be cremated. Act of March 25, 1982, ch. 703, 1982 Tenn. Pub. Acts 273 (codified as Tenn. Code Ann. § 62-5-501 (Supp. 1985)). The legislation, since repealed, addressed both the initial authorization to cremate and the disposal of the ashes after a cremation. Section 62-5-501(a) first established that "[t]he body of any deceased human being may be disposed of by cremation if such disposition of the body has been designated by the deceased in writing during his lifetime," and further provided that "[s]uch designation of cremation may include instructions for disposition of the ashes," and "[a]ny such instructions shall be followed by the person to whom the ashes are entrusted." Tenn. Code. Ann. § 62-5-501(a) (emphasis added). Section 62-5-501(b) established the order of priority in determining who had the authority over the ashes:

> Unless otherwise directed by the deceased in writing, the ashes following cremation shall be entrusted to the following in the order named:
> (1)   The surviving spouse;
> (2)   The surviving children of the deceased who have reached majority;
> (3)   The surviving parents of the deceased who are sui juris; and
> (4)   The next of kin.

(Emphasis added.) The other, more general aspects of the disposition of remains were governed by Tennessee Code Annotated, Title 53, chapter 5 (later Title 68, chapter 4).

In 1999, the General Assembly enacted a more comprehensive scheme to govern cremation, repealing the 1982 act in its entirety and adopting several new provisions. Act of May 13, 1999, ch. 215, 1999 Tenn. Pub. Acts 469. Section 11 of the 1999 act, which was codified as Tennessee Code Annotated section 62-5-511 (Supp. 1999), established a "safe harbor" provision shielding "[t]he operator of a crematory facility" from civil damages for certain acts, so long as those acts were taken in accordance with the statute. Although this act has since been substantially amended, it is instructive on the issue before us. Under the legislation, as it existed until recently, an operator could not be found liable for damages for

(1)     [h]aving performed the cremation of the decedent, or having released or disposed of the cremated remains, <u>in accordance with the instructions set forth in the cremation authorization form executed by the decedent on an antemortem basis</u>; [or]

(2)     [h]aving performed the cremation of the decedent . . . <u>in accordance with the instructions set forth in a cremation authorization form executed in person by the person authorized to serve as the authorizing agent for the cremation of the decedent</u> . . . named in the cremation authorization form[.]

Tenn. Code Ann. § 62-5-511(a) (emphasis added). The safe harbor was specifically contingent upon following a "cremation authorization form." Tenn. Code Ann. § 62-5-504 to -506 (Supp. 1999). Section 62-5-511(a)(1) addressed only situations where the decedent completed a cremation authorization form during his lifetime. In that respect, it was similar to the earlier, repealed regime under Tennessee Code Annotated section 62-5-501 (Supp. 1985), which authorized cremations "designated by the deceased in writing during his lifetime." Section 62-5-511(a)(2), however, went further, establishing a safe harbor for operators who cremate remains in accordance with a form completed not by the decedent, but by the decedent's "authorizing agent." "Authorizing agent" was defined as "the person or persons who are entitled to order the cremation of a decedent." Tenn. Code Ann. § 62-5-501(3) (Supp. 1999). Prior to death, an individual could, of course, be his own authorizing agent. Tenn. Code Ann. § 62-5-502(a) (Supp. 1999). An authorizing agent could also be "[a] guardian, custodian, or other personal representative who is authorized by law or contract to" execute the authorization form. Id. Tennessee Code Annotated section 62-5-503(a) (Supp. 1999) established the order of priority for determining who may serve as the authorizing agent by law. The family members had the highest priority, and priority among the family was prescribed as follows:

(1) The spouse of the decedent, at the time of the decedent's death;

(2) The decedent's surviving adult children. If the decedent is survived by more than one (1) adult child, any adult child of the decedent who states on the cremation authorization form that all of the decedent's other adult children have been notified of the decedent's death and of the plans to cremate the decedent and that none of them have expressed an objection to the cremation, may serve as the authorizing agent;

(3) The decedent's surviving parent or, if the decedent was under eighteen (18) years of age at death, a surviving parent or the guardian or custodian of the decedent. If the decedent is survived by both parents, either of them may serve as the authorizing agent by stating on the cremation authorization form that the other parent has been notified of the decedent's death and of the plans to cremate the decedent and that the other parent expressed no objection to the cremation;

(4) The person in the next degree of kinship to the decedent to inherit the estate of the decedent if the decedent had died intestate. If there is more than one (1) person of that degree of kinship, any of them may serve as the authorizing agent[.]

Id.

In 2000, the General Assembly once again made substantial changes to the laws governing cremation. Act of May 11, 2000, ch. 779, 2000 Tenn. Pub. Acts 2231. The 2000 amendment, the most recent alteration of the legislative scheme, repealed the prior year's "authorization form" and "authorizing agent" framework, while keeping some of the other language, including much of the original safe harbor terminology. The relevant sections of the section 62-5-511 safe harbor were, however, revised so as to provide as follows:

The operator of a crematory facility is not liable for damages in a civil action for any of the following actions or omissions, unless the actions or omissions were made with malicious purpose, in bad faith or in a wanton or reckless manner:

(1) Having performed the cremation of the decedent, or having released or disposed of the cremated remains, in accordance with the instructions set forth by the decedent or an heir or personal representative of the decedent[.]

Tenn. Code Ann. § 62-5-511(a) (emphasis added).

**Analysis**

Section 62-5-511 does not empower anyone to direct the method of disposal of a body. It is purely a limitation on the liability of operators of crematory facilities. Moreover, its immunity is not absolute; for a crematory facility operator to take advantage of section 62-5-511(a)(1), the operator's conduct must conform to certain requirements. First, the crematory facility operator must rely on the instructions of "the decedent or an heir or personal representative of the decedent" (the "authorizing party" requirement). Second, the operator must actually act "in accordance" with those instructions (the "conformity" requirement). Finally, the operator cannot act "with malicious purpose, in bad faith or in a wanton or reckless manner" (the "conduct" requirement). If all the conditions of section 62-5-511(a)(1) are met, an operator cannot be held liable, even if the person whose instructions it followed did not actually possess the right to direct the method of the disposal. The second certified question by the district court focuses on one aspect of the "authorizing party" requirement – specifically, who qualifies as an "heir."

"Heir" is not explicitly defined in section 62-5-511(a)(1). For the purposes of the statutes governing descent and distribution, however, "'[h]eirs' means those persons, including the surviving spouse, who are entitled under the statutes of intestate succession to the property of a decedent[.]" Tenn. Code Ann. § 31-1-101(5) (2007). The fact that section 62-5-511 uses not only "heir" but "personal representative" – another term from law of descent and distribution and defined in section 31-1-101 – suggests that it is this ordinary definition of "heir" that the General Assembly intended to adopt. Moreover, the definition offered in section 31-1-101 closely tracks those of authoritative dictionaries. See, e.g., Black's Law Dictionary 740 (8th ed. 2004) (defining "heir" as "[a] person who, under the laws of intestacy, is entitled to receive an intestate decedent's property").

Prior to the 2000 revision, section 62-5-503(a) explicitly stated that only an adult child could serve as an "authorizing agent" for the purposes of a cremation authorization form. In support of their position, the Defendants point out that this restriction was removed when section 62-5-503 was repealed and section 62-5-511 was amended. In response, the Plaintiff argues that the removal of that explicit restriction was inadvertent and does not signal an intent by the General Assembly to empower minor children to make decisions about cremation. A review of the legislative history of the 2000 amendment does not contradict the Plaintiff's interpretation. For example, a sponsor of the 2000 bill described the change as merely an attempt to remove a layer of bureaucracy – presumably the complex "authorizing agent"/"authorization form" framework. Statement of Sen. Tim Burchett, Senate Commerce, Labor & Agriculture Committee, Feb. 29, 2000. We have found no aspect of the legislative history that suggests any conscious intent to increase or decrease the rights of a surviving minor child.

Regardless of the intention of any individual members of the General Assembly, however, the language of the 2000 amendment is unambiguous, and "'[i]f the statute is unambiguous, we need only enforce the statute as written[,]' with no recourse to the broader statutory scheme, legislative history, historical background, or other external sources of the Legislature's purpose." Calaway ex rel. Calaway v. Schucker, 193 S.W.3d 509, 516 (Tenn. 2005) (quoting In re Conservatorship of Clayton, 914 S.W.2d 84, 90 (Tenn. Ct. App. 1995)). The term "heir," of course, does not exclude minors. In fact, our statutes repeatedly acknowledge that a minor qualifies as an heir. See Tenn. Code Ann. § 29-15-106(c) (2000) (referring to heirs who are infants); Tenn. Code Ann. §§ 30-2-203(a) , -409(a), -411, -416 (2007) (referring to heirs who are minors). Because the statute is unambiguous, we cannot rely on legislative history to depart from its plain meaning.

The Plaintiff also suggests that construing "heir" literally would qualify as absurdity, citing the traditional rule of statutory construction that "we will not apply a particular interpretation to a statute if that interpretation would yield an absurd result."[9] State v. Flemming, 19 S.W.3d 195, 197 (Tenn. 2000). The power to disregard a clear statutory text on the ground that it dictates an absurd result has been subject to criticism in recent years. See, e.g., John F. Manning, The Absurdity Doctrine, 116 Harv. L. Rev. 2387 (2003). Nevertheless, the "absurdity doctrine" remains a part of our state's law of statutory construction, albeit one that should be applied sparingly – only when a result is manifestly absurd, and not simply unpleasant or peculiar. We cannot find that it would be inherently absurd to provide a safe harbor for a crematory facility operator who, absent malicious purpose, bad faith, or wanton or reckless conduct, follows the instructions of a minor heir.

Finally, under the priority of interests adopted in response to Question 1 above, there inevitably will be at least one type of instance where the "heir" empowered to elect a

---

[9] Justice Stephen Johnson Field famously described this rule as follows:

The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted, "That whoever drew blood in the streets should be punished with the utmost severity," did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the Statute of 1 Edward II., which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire–"for he is not to be hanged because he would not stay to be burnt." And we think that a like common sense will sanction the ruling we make, that the Act of Congress which punishes the obstruction or retarding of the passage of the mail, or of its carrier, does not apply to a case of temporary detention of the mail caused by the arrest of the carrier upon an indictment for murder.

United States v. Kirby, 74 U.S. 482, 487 (1868).

cremation is a minor: the death of the child of a minor parent. The RUAGA explicitly confers rights only to adult children, adult siblings, and adult grandchildren, excluding minor children, minor siblings, and minor grandchildren. Tenn. Code Ann.§ 68-30-109(a)(4), (6)-(7). It contains no such exclusion for a minor parent. Tenn. Code Ann. § 68-30-109(a)(5). We have adopted those guidelines for the purposes of electing a cremation. As a result, it will sometimes be the case that a minor will, as a matter of law, be the heir empowered to make the decision about how to dispose of a dead body. If, however, we interpret "heir," as it is used in section 62-5-511, to exclude all minors, a crematory operator would not be able to use the safe harbor in that situation, despite the fact that the operator followed the instructions of the proper heir – the minor parent. That such a difficult result can be avoided by construing "heir" to include a minor further supports our reading of the statute.

We conclude that the word "heir," as used in section 62-5-511, retains its ordinary meaning and, therefore, includes minors. In order to avoid confusion, however, we must make an additional point. Simply because "heir" does not exclude minors does not mean that section 62-5-511 has failed to address the inability of a minor child of a decedent to authorize a cremation. As the parties agree, the section 62-5-511(a)(1) safe harbor does not apply if the action or omission is "made with a malicious purpose, in bad faith or in a wanton or reckless manner." Tenn. Code Ann. § 62-5-511(a) (emphasis added). "The reckless actor 'does not intentionally harm another, but he intentionally or consciously runs a very serious risk with no good reason to do so.'" Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville, 154 S.W.3d 22, 38 (Tenn. 2005) (quoting Dan B. Dobbs, The Law of Torts § 147, at 351 (2001)). Whether an act is reckless, wanton, in bad faith, or malicious is a question of fact. See Usary v. State, 112 S.W.2d 7, 10-11 (Tenn. 1938) ("Whether or not one is driving a motor vehicle on the highway 'carelessly and heedlessly and in wanton disregard of the rights and safety of others' is a question of fact which may fairly be submitted to and determined by a judge and jury."); Madden Phillips Constr., Inc. v. GGAT Dev. Corp., No. W2008-02350-COA-R3-CV, 2009 WL 3064898, at *24 (Tenn. Ct. App. Sept. 25, 2009) ("Tennessee courts have recognized in various contexts that the presence of bad faith is a question of fact."); Residents Against Indus. Landfill Expansion, Inc. v. Diversified Sys., Inc., No. 03A01-9703-CV-00102, 1998 WL 18201, at *4 (Tenn. Ct. App. Jan. 21, 1998) ("The issue of malice is a question of fact for the jury."); 57A Am. Jur. 2d Negligence § 290 (2004) ("Because a determination of whether conduct in a particular case constitutes willful and wanton conduct, reckless conduct, wanton misconduct, willful negligence, or some similar type of conduct is greatly dependent upon the particular facts of each case, it is generally within the peculiar province of the jury . . . ." (footnotes omitted)). While our limited record does not include the material facts, our view is that a cremation based on instructions from an individual whom the operator knows to lack the right to direct that remains be cremated may qualify as reckless. Because we are considering only certified questions of law, this is no occasion to apply that rule to specific facts.

**Question 3**

Finally, the parties have asked us whether Defendant H&F – which the amended certification order describes as "a funeral home operator, who subcontracted out the actual cremation to" Cremation Service – is the "operator of a crematory facility" for the purposes of section 62-5-511. Because we do not have access to the factual record of this case, we cannot answer that question definitively. Generally, however, a funeral home that does not perform cremations, but merely makes arrangements for cremations to be carried out by another company, is not itself the operator of a crematory facility and, in consequence, cannot rely on the section 62-5-511 safe harbor.

"Operator of a crematory facility" is not explicitly defined in our statutes.[10] Tennessee Code Annotated section 62-5-507 (2009) nevertheless provides a detailed account of the duties of "[t]he operator of a crematory facility." A close reading of these duties indicates that the General Assembly intended "operator" to refer to the party actually performing the cremations. Section 62-5-507(a) addresses an operator's ability to "schedule the time for the cremation of a dead human body . . . at the operator's own convenience." Section 62-5-507(b) imposes requirements on an operator's storage of a body "until the cremation process commences." Section 62-5-507(c) establishes that "[n]o operator of a crematory facility shall fail to cremate, in its entirety with the body, the casket or container, if any, in which the body was delivered or accepted by the crematory facility, if the instructions for the disposition of the body so request such item to be cremated with the body." Section 62-5-507(d) forbids an operator from cremating the remains of more than one decedent simultaneously in the same cremation chamber. Section 62-5-507(e) governs whom an operator may allow "to be present in the holding facility or cremation room while any dead human bodies or body parts are being held there prior to cremation or are being cremated or while any cremated remains are being removed from the cremation chamber." Section 62-5-507(f) deals with the possibility of operators removing items – such as dental gold – "from a dead human body prior to the cremation or from the cremated remains after cremation." Section 62-5-507(g) directs what an operator "shall" do "[u]pon the completion of each cremation." Sections 62-5-507(h) and (i) concern the return of cremated remains. Section 62-5-507(j) requires that an operator maintain an adequate system for identifying bodies, and section 62-5-507(k) forbids the knowing use of one cremation chamber for both humans and animals.

---

[10] "Crematory," however, "means the building or portion of a building that houses one (1) or more cremation chambers used for the reduction of body parts or bodies of deceased persons to cremated remains and the holding facility." Tenn. Code Ann. § 62-5-101(4) (2009).

Read together, these provisions establish that the operator of a crematory facility is the party actually responsible for the cremation. Mr. Sellars chose to maintain his funeral home business and his cremation business separately, as was his prerogative, despite their obvious complementary nature. Based on the summary of the facts available, we see no reason to treat both businesses as operators of the crematory facility. Nevertheless, we stress that our answer here is only a statement of the governing law. The district court has the duty to apply the law to the facts.

## Conclusion

Pursuant to the list governing the priority of rights in directing the method of disposal a dead body, a parent would hold a superior position to either a fiancée or a minor child. An "heir," as used in section 62-5-511, includes minor heirs; however, when a decedent left no instructions as to the method of disposal, a crematory may be reckless, depending on the circumstances, by reliance on the instructions of a minor heir. Finally, the term "operator of a crematory facility" does not include a funeral home that makes the arrangements for a cremation but does not itself perform the cremation. Costs are assessed one-third to the Plaintiff, one-third to H&F, and one-third to Cremation Service, for which execution may issue if necessary.

_____
GARY R. WADE, JUSTICE

-18-