IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 5, 2011 Session

# ROBERT F. MEREDITH ET AL. v. KENNETH L. WELLER ET AL.

**Appeal from the Chancery Court for Hamilton County**
**No. 09-0507     W. Frank Brown, III, Chancellor**

_____

**No. E2010-02573-COA-R3-CV-FILED-JANUARY 25, 2012**

_____

The plaintiff, Robert F. Meredith ("the Owner"), appeals a judgment rendered against him in favor of his home builder, Kenneth L. Weller ("the Builder"), on the Builder's counterclaim for breach of contract and for attorney's fees incurred in defending the Owner's claims for, among other things, defective construction, misrepresentation, breach of contract, and violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101 et seq. (2001)("the TCPA"). The Builder asks us to award him his attorney's fees incurred in defending the Owner's appeal. We affirm the judgment of the trial court in all respects. We also award the Builder his reasonable attorney's fees incurred on appeal and remand to the trial court for a hearing to determine those fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Fred T. Hanzelik, Chattanooga, Tennessee, for the appellant, Robert F. Meredith.

Phillip C. Lawrence, Chattanooga, Tennessee, for the appellees, Kenneth L. Weller, individually and dba Weller Construction, and Weller Construction, LLC.

**OPINION**

I.

In 2006, the Owner and his wife[1] purchased a lot on Lake Chickamauga in Hamilton County. The Owner "fell in love" with a particular set of house plans ("the Plans") entitled "Lakeview Cottage." He purchased eight sets of the Plans and started the process of selecting a contractor to build his "dream" home. He rejected two contractors. He approached the Builder[2] after noticing a "Weller Construction" sign on property in the subdivision.

There is no dispute that the Owner wanted the "Lakeview Cottage" built for a target price of $500,000 and, at least at the contract stage, he knew he would have to accept modifications to the Plans to achieve this price. On February 12, 2008, after several meetings, the parties signed a "Construction Contract" ("the Contract"). At the meetings, the parties discussed modifications to the Plans. The Builder's first cost estimate after several conversations was $614,000. When the Owner reiterated the need to bring the price under $500,000, further modifications brought the Builder's price to $554,000. This number was still above the Owner's budget and more modifications were considered. The Builder's third estimate was $496,000. At that point the Owner added a few items back into the mix and the parties agreed on a price, excluding the lot, of $501,686.

A general description of the house will be helpful. It has two stories of living space above a full basement. The first floor is approximately 2100 square feet plus a three car garage, a rear deck and the front porch. The second floor is approximately 500 square feet with a studio room, a bathroom, a walk-in closet, and the option of either one or two bedrooms. The interior features wood beams and hardwood floors for the most part. The exterior features wood beams, stone, and cedar shake siding. For the reader's benefit we have shown, as Figure 1., a reduced image of the house shown on sheet E1 of the Plans.

---

[1]In addition to the Owner, his wife, Patricia Meredith, was named as a plaintiff in the complaint. She did not sign the contract with the Builder and did not testify at trial. Her claim was dismissed before the court entered its judgment. She has not appealed. We will refer to the plaintiff in the singular.

[2]The complaint names Kenneth L. Weller, individually, and further identifies him as dba Weller Construction. It also names Weller Construction, LLC, as a defendant. For simplicity, we use the reference "the Builder" to include all of these defendants.



Figure 1.

A photograph of the completed house, overlooking Lake Chickamauga, is in Figure 2.



Figure 2.

There are three documents that are part of the Contract. The first is the "Building Plans," which is the document we have identified as "the Plans." Pages A1, A2 and B1 of the Plans contain handwritten modifications and the initials of both parties signifying their agreement to those modifications. The modifications include omission of one fireplace, omission of a closet, reduction in the size of a deck, selection of the single upstairs bedroom option, and an unfinished basement. The second document is a "Building Specifications Sheet" ("the Specifications"), which is actually multiple pages. It is likewise initialed by both the Builder and the Owner. Among other things, it states that the garage is to have

"three standard [7 foot by 9 foot] insulated garage doors." With reference to the upstairs, or "second floor," it refers to only one bedroom and a studio. The third document is an "Allowance Sheet," which, again, is several pages in length, from which the Owner could choose up to $153,400 in allowance items to "be incorporated into construction." Allowance items are assigned a cost. The Owner receives a credit for any allowance item that is less than the assigned cost and pays extra for any item that is more expensive than the assigned cost. The Allowance Sheet contains a warning that "[a]llowances have been figured at minimum cost" and that "[the Owner] should expect to go over the allowance amount in several categories." Examples of allowance items are interior doors, kitchen and bath cabinets, lighting fixtures, stairs, windows, and interior trim.

The Owner financed the construction through Branch Banking & Trust ("BB&T"). BB&T was to pay the Builder in draws as the work progressed. On or about September 29, 2008, the Builder sent the Owner an email stating that the "final total of overages & extras is $10,372." He asked for a reimbursement check. On or about October 4, 2008, the Owner gave the Builder a "check for the keys" and both parties signed an undated document that states:

> The construction of a custom residence at 2444 Burton Road,
> Sale Creek, Tennessee for [the Owner] has been completed. . . .
> All work on the interior and exterior of the house is
> complete. . . . Final payment of all overages has been made by
> the [Owner].

At that point, however, BB&T had not made its final disbursement to the Builder in the approximate amount of $50,000. When BB&T did make the final disbursement on or about October 15, 2008, the total of payments to the Builder, according to the bank's records, fell short of the contract price of $501,686 by $4,481.52. The Builder notified the Owner of the shortfall.[3] BB&T confirmed the shortfall to the Owner, but the Owner did not pay it to the Builder. The Owner took the position that the document acknowledging payment of "all overages" covered any and all payments due. The Builder, in turn, refused to perform warranty work. The Contract contains a waiver by the Owner in bold print of "any and all rights and remedies under the . . . [w]arranty if there is any money owed to the [Builder] . . . unless such money is placed in escrow." After commencing this action, the Owner did place $4,481.53 in escrow with the trial court. The Builder then performed corrections that he considered to fall within the warranty and refused to perform work for corrections that he viewed as outside the warranty.

---

[3]The Builder's number was $4,481.53, one cent more than BB&T's number.

The trial court commented on certain communications from the Owner to the Builder that provide some insight as to when and how the relationship went sour:

> [The Owner] wrote on May 10, 2008, . . . that "I am very pleased with the quality and speed of work so far." [The Owner] states in . . . an email dated May 27, 2008, that he was "thrilled with the progress til I saw the windows in the front." . . . On July 28, 2008, . . . [the Owner] said he was very pleased with the quality of everything that has been done. In a string of emails, . . . [the Owner] states that "[o]ther than the windows in the front, the house is the house I want."

> The court believes the emails hold other evidence of some of the issues that made this such an explosive case. In a June 24, 2008 email, [the Owner] writes that "Patti [Mrs. Meredith] never read the contract and was unaware of the restrictions and potential extra costs." The [Owner] pushed to increase and restore the house toward the [P]lans. This increased their costs, which adversely affected their cash flow. [The Builder] became adamant about being paid the balance. [The Owner] had some issues occur and [the Builder] would not do any warranty work without being paid in full.

The Owner commenced this action on July 6, 2009. The complaint alleges breach of contract, defective construction, lack of good and sufficient workmanship, violation of the implied warranty of good workmanship, negligence, negligent and intentional misrepresentation, and violation of the TCPA. An amendment to the complaint adds a claim of promissory estoppel. As amended, the complaint asks for damages of $300,000 to be trebled under the TCPA to $900,000 or, alternatively, punitive damages of $200,000. The Builder's answer includes a counterclaim that demands the unpaid balance due on the Contract. Both parties ask for attorney fees under the TCPA as well as the Contract. The Contract contains a "Litigation Fees" clause that requires the losing party to pay "all costs of litigation including reasonable attorney's fees" to the "successful party."

It is impossible and impracticable to identify each and every criticism the Owner leveled at the Builder in the course of an eight-day trial. The trial court accurately characterized them as falling within

> two groupings. First, [The Owner] claim[s] the [Builder] did not construct the dwelling in accordance with the architect's

plans and other contract documents. Second, [the Owner alleges] that the [Builder] did not complete all of the work and that some of the construction work was defective.

With two minor exceptions, the court found the Owner's claims to be completely without merit. We will attempt to set out the problems of which the Owner complains, the proof, and the court's resolution as to each alleged problem.

## ELIMINATION OF SECOND
## BEDROOM ON SECOND FLOOR

The Owner admitted that he initialed page A-2 of the Plans beside the handwritten note, "This opt for 2nd level" with an arrow pointing to the version of the second story floor plan providing for only one bedroom upstairs. The Owner claimed he was "tricked" into initialing something that it would have been preposterous for him to have accepted. The Owner claimed that no sensible homeowner would build an expensive house with only two bedrooms total.[4] The Owner claimed also that other items omitted from the Plans were indicated by the word "omit" and that since there was no "omit" on page A-2, he did not understand that the second bedroom on the second floor was being omitted. The Owner claimed that the first time he was aware that he was only getting one bedroom upstairs was on April 2, 2008, when he visited the site with his wife and noticed that there was framing for only one upstairs bedroom. He claimed that is when he first received and initialed the Specifications.

The Builder testified that the option of one bedroom upstairs was specifically discussed and chosen by the Owner as part of the need to keep costs down. The Builder also introduced proof that the house, if built in strict compliance with the Plans with a second bedroom on the second floor, would have intruded upon mandatory setbacks. The Builder acknowledged that, if the Plans had been modified, a second bedroom could have been built on the second floor in a way that would have complied with the setbacks. The Builder testified that all documents including the Specifications were signed at the same time. The Builder introduced proof that the framing was not in place at the time of the Owner's visitation on April 2, 2008. The footers were then barely in place.

On this issue, among others, the court

> did not find [the Owner] to be credible. The big issues he
> asserted, signing [the] Specifications in April, not agreeing to

---

[4]By the time of trial, the Owner had added a third bedroom in the basement.

only one bedroom upstairs, the size of the garage doors, and not agreeing to a ventless fireplace in lieu of the wood-burning fireplace, went against him. [The Owner's] credibility was damaged greatly and the court did not believe his testimony on these issues. On the other hand, [the Builder] appeared calm during the trial and the court found his testimony to be credible and confirmed by the testimony of other witnesses. . . .

The court made extensive and specific findings with regard to a single bedroom on the second story.

[The Owner] says he was tricked or made a mistake with regard to Sheet A-2. He asserts that the other changes said "omit." So, he thought this writing said omit. The court cannot accept [the Owner's] version. One, there are 3 "omits" and one "reduction size change" on Sheet A-1. Two, the phrase on A-2 is much longer than the word "omit." [The Owner] should read what is written and what he initials. The law in Tennessee is clear [that a person cannot sign a writing and deny that it expresses the agreement he made] . . .

\* \* \*

The . . . Specifications were introduced as Trial Exhibit 9. . . . The description of the second floor is found on page 2 of the Specifications. Trial Exhibit 9 provides the Specifications for the studio and the guest bedroom. Only one bedroom is mentioned. The term "bedroom" is not mentioned in the plural in the Specifications.

. . . [The Owner] attempts to escape the terms and provisions in the Specifications by pointing out that there is no date on the . . . Specifications. The parties did not insert a date beside their initials on the house plans either. . . . [The Owner] says he . . . initialed Trial Exhibit 9 on April 2, 2008. He remembers the date because there was a note in his day timer, Trial Exhibit 140, and that was the date he went to the house and noticed only one bedroom upstairs. Indeed, in his first deposition . . . [the Owner] testified he noticed the one bedroom in mid-March. . . . Both dates were proven incorrect because the framing for the

-7-

house had not started on April 2, 2008. On rebuttal, [the Owner] stuck to his story about the framing but conceded the date was wrong.

In addition to the contract documents, [the Owner] also has problems with waiver. For example, if [the Owner] was correct that he knew for the first time that there was only going to be one bedroom upstairs when he saw the rooms framed, he should have stopped work at that point until the issue was resolved. He did not. Even Don Walker, [the Owner's] building expert, said such and said it was too late to change the number of bedrooms after the house is completed. [The Owner] could use the studio as a second bedroom.

The second bedroom would have extended the exterior of the house beyond its boundaries. The Restrictive Covenants prohibit a dwelling from being closer than ten feet to a lot line. . . . The two bedroom alternative would have placed the house within 9.1 feet of the lot line, according to a survey by David Mathews. . . . [The Owner] had already moved the house once as a result of discussions with a previous builder.

The court finds that the . . . Specifications were in existence and were initialed on February 12, 2008 when the . . . Contract was signed. The Specifications are referred to in Article I. of the . . . Contract. If the Specifications were not present, [the Owner] should have noted such on the . . . Contract and inquired about the Specifications. The court does not find [the Owner's] testimony on the issue of when the Specifications were initialed to be credible. The court accepts [the Builder's] testimony in regard to the Specifications and the date of signing. The Contractor would have needed to have the Specifications approved in order to commence the construction. Ms. Weller also testified that the Specifications were signed on February 12, 2008. The Wellers produced a picture of their computer showing the . . . Contract and Specifications were prepared on February 11, 2008.

## THE ELIMINATION OF A WOOD-BURNING FIREPLACE
## AND ELIMINATION OF ALL EXTERIOR CHIMNEYS

The Plans show multiple fireplaces and multiple exterior chimneys. The Specifications call for a "vented 42 [inch] fireplace with stone hearth and face" in the "keeping room" and a "42 [inch] ventless gas fireplace with stone hearth and face" in the "lodge room." The subject of fireplaces is also covered in the Allowance Sheet as follows: "Fireplace Boxes, Venting, Mantle, Face, Hearth, Gas Line, & Fire Logs (Mat'ls & Labor): $5,000 (Total of Two)." The house as built had two ventless gas fireplaces with no exterior chimneys. There is no dispute that the company that supplied the fireboxes mistakenly delivered two ventless units instead of one vented and one ventless unit. It is also undisputed that the mistake was discovered before the installation was complete and the Builder was willing to correct the mistake. Further, it is undisputed that the Owner agreed to accept a ventless fireplace in the keeping room in place and instead of the vented fireplace. It is also undisputed that a chimney for a ventless fireplace would serve no function. The Owner claimed at trial that he did not understand that substitution of a second ventless fireplace would eliminate the chimney and that the lack of a chimney detracts from the appearance of the house.

As we have detailed above, the court found that the Owner agreed to the substitution and that any testimony to the contrary was not credible. The court further found that the

> fireplaces were an allowance item and the two ventless units
> saved [the Owner] money ([he] used elsewhere). Despite his
> agreement to the two ventless units, [the Owner] never "let go"
> of his loss of the wood-burning fireplace.

## SIZE AND TRIM FOR GARAGE DOORS

The Owner contends that he should have had 8 foot by 9 foot garage doors with arched openings. That is the configuration in the Plans. However, the Specifications provide for "three standard [7 foot by 9 foot] insulated garage doors." The Builder testified that in addition to agreeing to and knowing that the smaller doors were being used, the Owner made the choice to compensate for the loss of arched openings by having the stone mason lay stone arches over the garage doors.

Again, this was an issue on which the trial court found the Owner to be lacking in credibility. Further, the court found that the configuration of the garage doors was controlled by the Specifications.

## CHANGES IN THE ROOF LINE

The Plans reflect a complicated roof line with a myriad of different slope configurations. The Owner complains that the house as build is just one big flat roof that detracts from the appearance. The Builder testified that the house still has a complicated roof line, with dormers, multiple gables and valleys. He testified that any changes to the roof line were a necessary part of trying to reduce the price from approximately $1,000,000 which it would have cost to build the house contemplated by the Plans, to the Owner's budget of $500,000. He testified that changes in the roof were discussed.

The court specifically found that changes to the roof line were made to reduce the cost. In setting forth the background of the case, the court noted that changes to the roof discussed by the parties were part of the basis for reducing the Builder's cost estimate to the final number of just over $501,000. The court further found that the Owner failed to object to any changes in the roof line at a time when they could have been corrected, and, as a consequence of this failure, implicitly waived any issue as to changes in the roof line.

## OVERSPANNING

The Owner claimed that the Builder cut corners on the floor joist, ceiling joists and rafters to save money by using lumber smaller than that reflected in the Plans and lumber that did not meet code requirements. The term "overspanning" was used in the trial court to describe the practice of spanning a distance too long for the size of the lumber used.

The Plans call for 14-inch manufactured floor joists. The Builder installed 11 7/8-inch manufactured joists. The Owner presented the testimony of a home inspector who testified that he measured the joists, particularly on a deck, and found them to be on 16-inch centers and too small for the spans. On cross-examination he admitted that he made no notes of his measurements. He claimed that he is able, without notes, to recall all the measurements he makes in his inspections.

The Builder testified that the joists on the part of deck with a long span were actually spaced on 12-inch centers and that the joists were, as installed, well within code and manufacturer's recommendations. He further testified that the joists he used were a version manufactured with a wider flange which gives them more strength and span. Further, he testified that the Owner's expert did not take into account some support beams that reduced the span of the joists on the main floor. The Builder supported his testimony with, among other things, charts commonly used in the building trades showing acceptable spans, and photographs of himself making measurements of the spacing and span of the joists and support beams.

The Owner complained that the rafters and ceiling joists are 2 by 6s but are supposed to be 2 by 8s. His expert testified to measuring them but he acknowledged that he had not made any notes of his measurements. The Builder admitted that the rafters are 2 by 6s but testified that the ceiling joists are 2 by 8s. The Builder further testified that the rafters are braced and that, as braced, the 2 by 6 rafters are stronger and more dependable over time than the 2 by 8s would be. According to the Builder, this principle is illustrated by the use of trusses, most of which employ 2 by 4s with liberal bracing. The Builder testified that over time the unbraced 2 by 8s will sag while braced 2 by 6s will not. One of the Builder's witnesses was a registered structural engineer who testified that the structural members, including the floor joists and rafters, are within code requirements. The Owner did not cross-examine that expert.

The trial court lumped all the "spanning issues" together. It summarized the testimony on the issue and found

> that [the Owner] has not proved any unsafe or improper spanning. The [Builder's] adding a support beam to the floor system handled one floor span issue. Numerous pictures and documents showing acceptable spans were introduced.

Despite finding that the bracing was adequate with regard to strength and spanning issues, the court did find some problems in the attic for which it allowed the Owner $1,500 out of the funds previously paid by him into escrow. Specifically, the court found:

> The bracing works but there are exposed, but bent, [n]ails. The insulation has been knocked down and appeared to be lacking in a few areas. [The Owner] thought he could use the attic for storage but the issue was never discussed between the parties.
>
> *   *   *
>
> . . . . The court also allows [the Owner] $1,500 for the attic. The bracing is rather poorly done in places. Although the Hamilton County inspectors did not note any attic insulation problems, there are now a few places where the insulation is shallow. Some places appear to have inadequate insulation. [The Owner] can use this $1,500 as he sees fit. . . .

## FIBERGLASS TUB ENCLOSURE IN
## SECOND STORY BATHROOM

The Owner complained that the Plans call for a cast iron tub and tile enclosure for the second story bathroom and that the Builder made the unauthorized substitution of a fiberglass tub and shower enclosure. However, the Specifications provide for a "5[-foot] fiberglass tub-shower with chrome shower door." The court found that the Specifications were part of the Contract from the February 12, 2008, signing date and defeated the Owner's contention.

## UNTEMPERED GLASS IN WINDOWS

By all accounts, the house has a spectacular view of Lake Chickamauga. To maximize the view, the house incorporates numerous windows on the side facing the Lake. The Owner's home inspector testified that the windows were not made of tempered glass as required by code. The inspector was cross-examined by use of the building code section that he relied upon for his testimony. However, the trial court found that the Owner's expert clearly misconstrued that section to require tempered glass if any one of four conditions were present when, in truth, "[f]our requirements were needed for the mandatory use of safety glass windows." One of those four requirements was that the "[b]ottom edge [be] less than 18 inches (457 mm) above the floor." The same expert testified that even though he made no notes of his measurements, the bottom edge of the window was less than 18 inches from the floor. The Owner testified that he measured the windows and that they were 21 inches from the floor. The Owner supported his testimony with photographs of his measurements. The court found that the "windows were not within 18 inches of the floor."

## CUPPED FLOORING

The Owner testified that water blew in around windows during a storm and that the hardwood flooring in that area "cupped." The Builder did not dispute that the flooring had indeed cupped and he admitted that cupping is usually from moisture from some source. However, the Builder testified that some repairs were made to the floor before the completion document was signed and that at the final walkthrough the floor was not damaged. The Builder did not believe any problems that arose after the final walkthrough should be his responsibility because of the waiver of warranty provision in the Contract and the Owner's refusal to pay the balance owed until after this action was commenced.

The court sided with the Builder. It noted that there was no mention of the problem until after the final walkthrough and that the Owner did not pay the balance owed or take any steps to cure the problem despite knowing that it existed. The court found that any damage

had been done by the time the Owner paid the balance owed into escrow and that the Owner "cannot recover because he failed to mitigate his damages."

## SEWER PUMP

The basement is located below the grade of the sewer system. Waste water from the basement level must be pumped to the level of the ground floor. The Contract requires the Builder to provide "rough in" plumbing for the basement, including the pump. The Owner finished part of the basement, including a bathroom, after the completion documents were signed. In the course of doing that, the Owner found that the pump was rusted and not operational. The Owner testified that the electrical wires to the pump were cut and surmised that the Builder installed a used, non-functional pump. The Builder testified that a subcontractor installed a new pump. The Owner called the plumbing subcontractor as a witness. The plumbing subcontractor testified that he did not install the pump in the basement.

The court found that the Owner was entitled to recover the contract price for the pump but stopped short of finding that the Builder violated the Contract with regard to the pump. The court simply stated

> there was to be a septic pump installed in the basement floor. The hole was prepared and the pump was placed in the hole. Later the pump was hooked up and covered. In the interim there was water in the hole and rust occurred. The pump should be replaced.

The court awarded the Owner $410.67 out of the funds in escrow to cover the cost of replacing the pump.

## LACK OF STEPS TO FRONT PORCH

The Plans show a front porch with "stone steps per grade." As constructed the porch is close enough to ground level that no steps are present. The Owner's position at trial was that the lack of steps turned what was supposed to be porch into a "cheap looking" patio. It was the Owner's position that the lack of steps is a breach of the Contract because of the deviation from the Plans. The Builder testified that the finished grade of the lot chosen by the Owners was such that steps were not practical. The Builder also pointed to a provision in the Contract that states:

It is also understood by the [Owner] that the measurements on the Drawings/Plans and in the Specifications language will not always agree with the actual field measurements and visual expectations.

The trial court found that the "problem was a relatively flat yard" that would have required either raising the house or lowering the grade of the yard to accommodate steps. The court did not expressly state whether or not the lack of steps was a violation of the Contract. However, it did expressly state that other than the problems with the sewer pump and the attic, the Owner failed to prove any of his numerous claims.

## DEBRIS AND GRADING

The Owner testified that the yard was unevenly graded and that it was strewn with debris, such as pieces of plastic pipe, litter, bottles and cans. He introduced numerous photographs of the debris. The Builder testified that he graded and seeded the yard properly and that, when his crew left, the yard was free of debris. It is undisputed that after the Builder left the premises, the Owner had other people working on a boat dock and pathway from the house to the dock, along with landscaping. Also, the Owner had other contractors present working on the basement and cedar siding. In May of 2010, after the Owner paid the balance of the Contract price into the court, the Builder performed some remedial grading and sodding. The Builder and one of his employees testified that when they did the remedial work there was a deep rut along one side of the driveway caused by the tires of a vehicle.

The trial court found the Owner

> did not prove the debris, bottles, and cans in the backyard came from the [Builder's] agents or employees. [The Owner] hired others to build a walled walkway to the river. Also, he employed another contractor to finish the basement. These people were at the . . . home after the [Builder's] agents left. [The Owner] made no complaint about debris before the closing.
>
> The yard's problems were due in part to a truck coming off the driveway and running over the irrigation pipe. A rut was caused by the truck. The [Builder] did some resodding in this area and more sodding was done in May of 2010.

## LACK OF CHANGE ORDERS

The Owner testified that the Contract requires that any changes to the Contract be the subject of a written change order. He testified that the Builder deviated from the Plans in the ways we have set forth above and others without presenting even one change order. He admitted on cross-examination that he took several copies of the change order form and could have prepared change orders himself. The Builder testified that it is his practice to only use change orders on substantial changes and that none of the changes to the house at issue were, in his opinion, substantial enough to warrant a change order.

The court found, first, that the parties modified the Plans substantially in the negotiations that led to the signing of the Contract. These modifications included things that were expressly mentioned in the writing, such as the size of garage doors, as well as things that were not expressly mentioned, such as changes in the roof and other features to accommodate the Owner's budget. The pre-signing modifications covered "most" of the departures from the Plans and were part and parcel of the Contract. As to changes not expressly covered by the written contract, the court found that the Owner had waived the requirement of a change order by requesting and allowing changes to be made without insisting on change orders. Further, the court found that the Owner had ratified the changes by signing the completion documents without reserving any objections.

Regarding the Builder's claim to the unpaid balance of the price of the Contract, the court found "[t]here is no doubt that [the Owner] owes the balance due." The court accepted the lending bank's record of construction draws and found that the amount owed is $4,481.52, exactly one cent less than the amount claimed by the Builder. The court then allowed the Owner "offsets or credits" of $410.67 for the sewer pump and $1,500 for the attic for a total of $1,910.68 to be paid by the clerk and master to the Owner from the funds in escrow. Except for this award, the court dismissed all claims made by the Owner with prejudice. The court ordered any remaining balance of the funds in escrow, after deduction of court costs, to be paid to the Builder.

As to the claims for attorney's fees under both the TCPA and the contract, the court found that

> [the Owner] has not been successful in proving that the
> [Builder] . . . violated the TCPA. Instead, the court holds that
> [the Owner's] TCPA claims are "frivolous [and] without legal
> or factual merit." [The Builder] committed no act of fraud or
> deceit. [The Builder] did not commit any unfair or deceptive
> act. [The Owner] made a deal to change the house plans so he

could afford the house. As the project neared completion, he got buyer's remorse and tried to get the [Builder] to restore, at [the Builder's] costs, some of the reductions to or changes in the house. [The Owner's] charges of [the Builder] tricking him, defrauding him, and changing the construction plans unilaterally were frivolous and had no basis in fact. Evidently, [the Owner] thought he could have his home and recover from [the Builder] half the money he spent for it.

Based upon the Affidavits, the court's knowledge of this case, and other attorneys' charges in this community, the court awards [the Builder] attorney's fees against [the Owner] in the amount of $45,000 [of the $54,207.50 requested]. This award is justified under both the TCPA and the contractual provision. The court knowingly has not granted [the Builder] their full attorney's fees because the court did grant [the Owner] some relief, payable from the funds on deposit with the Clerk & Master.

## II.

The Owner raises the following issues on appeal, as taken verbatim from his brief:

Did the Court [e]rr in awarding the [Builder] attorney's fees?

Did the Court [e]rr in not enforcing the contract provisions, thus not finding a breach of contract, with all due credits and amounts owed to the [Owner]?

The Builder raises the issue of whether he is "entitled to attorney's fees for defending the appeal of this case."

## III.

Our standard of review in this case is as stated in *Morrison v. Allen*, 338 S.W.3d 417, 425-26 (Tenn. 2011).

In a civil case heard without a jury, the trial court's findings of fact are presumed to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Langschmidt*

-16-

*v. Langschmidt*, 81 S.W.3d 741, 744 (Tenn. 2002). When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witness' demeanor and to hear in-court testimony. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (*quoting Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). Questions of law are subject to de novo review with no presumption of correctness. *Seals v. H & F, Inc.*, 301 S.W.3d 237, 241 (Tenn. 2010); *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008) (*citing Perrin v. Gaylord Entm't Co.*, 120 S.W.3d 823, 826 (Tenn. 2003)).

The interpretation of a written contract is a question of law. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). The decision whether or not to award attorney fees pursuant to the TCPA is reviewed for abuse of discretion. *Aslinger v. Price,* No. E2006-00029-COA-R3-CV, 2006 WL 2521566 at *8 (Tenn. Ct. App. E.S., filed Sept. 1, 2006) (*citing Glanton v. Bob Parks Realty*, No. M2003-01144-COA-R3-CV, 2005 WL 1021559 at *9 (Tenn. Ct. App. M.S., filed April 27, 2005)). However,

> [w]hen the parties' contract provides that the prevailing party is entitled to reasonable attorney's fees in litigation to enforce the contract, the party who prevails is contractually entitled to recover its reasonable attorney's fees, and the trial court has no discretion regarding whether to award attorney's fees or not. However, determining the amount of the attorney's fee that is reasonable is within the trial court's discretion.

*Hosier v. Crye-Leike Commercial, Inc.*, No. M2000-01182-COA-R3-CV, 2001 WL 799740 at *6 (Tenn. Ct. App. M.S., filed July 17, 2001) (citations omitted).

IV.

A.

Obviously, we need to address the issue of whether the trial court erred as to the merits of the action before we consider whether it erred in awarding attorney's fees to the Builder. The Owner asserts two reasons that the trial court erred. The Owner argues that the trial court erred in not holding the Builder to the strict terms of the Contract. The Owner criticizes the trial court's reliance on *M.R. Stokes Company, Inc. v. Shular*, M2006-02659-COA-R3-CV, 2008 WL 544665 at *4 (Tenn. Ct. App. M.S., filed Feb. 26, 2008) for the proposition that the requirement of change orders was waived. The Owner argues that in the present case, unlike *Shular*, "[c]hanges were made by the [Builder], at the [Builder's] doing. Only afterward, would they be pointed out, or discovered after completion and never agreed upon by the [Owner]."

There is no necessity for an extensive comparison of the present case to *Shular*. The problem with the Owner's position is that he is still trying to hold the Builder to the obligation of building the exact house depicted in the Plans despite the overwhelming evidence that the parties did not contract for that exact house. The trial court specifically found that the Plans were modified significantly to accommodate the Owner's budget, that many of those changes were specifically discussed and included in the Contract as signed by the parties and that, as the house neared completion, the Owner started trying to force the Builder to build the house depicted in the Plans. The Owner's testimony to the contrary was found to be unbelievable. The trial court's credibility determinations are binding on this court absent clear and convincing evidence to the contrary. *Morrison*, 338 S.W.3d at 426. The Owner did not come close to showing clear and convincing evidence to attack the trial court's credibility findings. To the extent there were changes from the Contract documents, they were agreed to as found by the court. We have reviewed the record carefully and we conclude that the evidence does not preponderate against the trial court's findings as to the requirements of the Contract or the quality and completion of the work. One example of the many instances of the parties agreeing to something slightly different from the Contract is the substitution of a second unvented fireplace. The record leaves no doubt that, notwithstanding the lack of a change order, the Owner decided to accept a second unvented fireplace. His argument that this type of change is a violation of the Contract is not convincing.

The Owner also seems to suggest that the trial court erred in admitting parole evidence of verbal agreements that varied the terms of the writing. Our review of the record shows that the Owner – during his direct testimony as the first witness to testify – gave a lengthy history of the dealings between the parties, including many agreements reached during the

course of construction. The substitution of a second unvented fireplace was among the subjects of his testimony. Even if we otherwise found merit to the suggestion, and we stress that we do not, it would not be appropriate to relieve the Owner of any such error because he introduced it into the record. *See* Tenn. R. App. P. 36(a).

The Owner also argues that even if the Builder is not held to the express terms of the Contract, changes from the Contract saved the Builder money that he did not pass along to the Owner. This argument suffers from the same problems as the above argument. It ignores the evidence and the findings of the trial court. By reference to the example of the unvented fireplace, the trial court considered the evidence and concluded that any money saved was passed along to the Owner. There is no merit to the Owner's argument that the Builder changed the Contract to save himself money and did not pass those savings along to the Owner. As the trial court expressly found, the parties worked mightily to find areas within the Plans where costs could be shaved. The Contract incorporated those cost-saving measures which the Owner now refuses to acknowledge. We hold that the trial court did not err in finding that, with the very limited exceptions of the attic insulation and some cosmetic issues in the attic, the Owner failed completely to prove his claims.

B.

We turn now to the Owner's argument that the trial court erred in awarding the Builder a portion of his attorney's fees. The argument focuses primarily on the TCPA claim and whether fees were properly awarded under the TCPA. The Owner argues that the award is, in effect, punishment for not succeeding. He argues that such an approach is contrary to the policy behind the TCPA. The trial court, however, went further than simply finding against the Owner on his TCPA claim. The trial court specifically found that the claim was "frivolous [and] without legal or factual merit." (Brackets in original). The legislature has specifically articulated a policy of discouraging TCPA actions that are frivolous and without merit by allowing attorney's fees against the persons who file such actions. Tenn. Code Ann. § 47-18-109(e)(2)(Supp. 2011). The court found that, contrary to the Owner's allegations, the Builder did not engage in deceit or unfair practices. It also made the determination that the Owner was not believable. The court clearly believed that the Owner knew the Builder had not engaged in any deceit. The court did not penalize the Owner; it simply applied the TCPA according to its terms to a party that it found had misused the TCPA.

Moreover, the trial court specifically found that attorney's fees were in order under both the TCPA and the Contract. The primary argument the Owner makes against the award of attorney's fees under the litigation expense clause of the Contract is that "both parties prevailed under the Chancellor's ruling." The Owner references his recovery of $1,910.68 of the monies placed in escrow.

The law is not on the Owner's side with respect to this issue:

> Tennessee courts have defined "prevailing party" for purposes of attorney's fees clauses in contracts as "the party to a suit who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not necessarily to the extent of his original contention. The one in whose favor the decision or verdict is rendered and judgment entered." *Dairy Gold, Inc. v. Thomas*, No. E2001-02463-COA-R3-CV, 2002 Tenn. App. LEXIS 548, at *10 (Tenn. Ct. App. July 29, 2002) (*quoting* Black's Law Dictionary 1188 (6th ed.1990)).

*Clark v. Rhea*, M2002-02717-COA-R3-CV, 2004 WL 63476 at *3 (Tenn. Ct. App. M.S., filed Jan. 13, 2004). There can be no doubt that the Builder prevailed on the "main issue" in this case. The Owner is the party who initiated this action. He sought $300,000 in damages, trebled to $900,000, and, as an alternative to triple damages, punitive damages. In defending those claims, the Builder was successful by any standard. Further, the Builder was successful in proving that there was an unpaid balance due under the Contract. We find no merit to the argument that the trial court erred in awarding the Builder a portion of his attorney's fees.

## V.

The Builder argues that, for several reasons, he is entitled to his attorney's fees incurred in defending this appeal. He argues that the appeal is frivolous, and, alternatively, that he is entitled to attorney's fees under the Contract as the prevailing party. We agree with the latter argument and therefore do not decide the former. The Builder is the successful party on appeal and the appeal is, by the choice of the Owner, a necessary part of this litigation. Under the terms of the Contract, the Owner is entitled to "reasonable attorney's fees." We will leave the amount to be determined by the trial court on remand.

## VI.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Robert F. Meredith. The Builder is awarded reasonable attorney's fees incurred in defending this appeal. This case is remanded to the trial court, pursuant to applicable law, for determination of a reasonable attorney's fee, for enforcement of the judgment, and for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE