# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
August 28, 2012 Session

## ERIK HOOD v. CASEY JENKINS, ET. AL.

**Appeal from the Chancery Court for Grainger County**
**No. 0908101     Hon. Telford E. Forgety, Jr., Chancellor**

---

**No. E2011-02749-COA-R3-CV-FILED-OCTOBER 9, 2012**

---

This appeal involves a claim for breach of a life insurance contract issued by Old Line. Father named his son, a minor, as the beneficiary of his life insurance policy. When Father died, the proceeds of the policy were issued to minor's older sister, who depleted the funds. Beneficiary filed suit against Sister and Old Line, alleging that Sister misappropriated the life insurance proceeds and that Old Line erroneously awarded the proceeds to Sister without proper documentation. A default judgment was entered against Sister. Following a trial on Beneficiary's claim against Old Line, the court ordered Old Line to re-issue a portion of the proceeds to Beneficiary. Old Line appeals. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Michael S. Kelley, Knoxville, Tennessee, for the appellant, Old Line Life Insurance Company of America.

Bruce T. Hill, Sevierville, Tennessee, for the appellee, Erik Hood.

## OPINION

## I. BACKGROUND

In 2002, David R. Hood ("Father") purchased a $100,000 life insurance policy from Old Line Life Insurance Company of America ("Old Line"). Father named his son, Erik Hood ("Beneficiary"), as the beneficiary under the policy. On September 17, 2007, Father died. Beneficiary's older sister, Casey Jenkins ("Sister"), invited Beneficiary to live with her and her family. After Beneficiary moved into Sister's house, Sister filed a petition for guardianship in the juvenile court. Thereafter, Old Line received a claim on the policy from Beneficiary. Realizing that Beneficiary was a minor, Old Line responded to the claim by requesting "Guardianship Papers for the Finances of the Minor Beneficiary." In response to Old Line's request, Sister faxed the order of guardianship received from the juvenile court, along with the petition for guardianship to Old Line. The order provided,

### ***APPOINTMENT OF GUARDIAN OF THE PERSON***

> This cause came to be heard upon a sworn petition and IT APPEARING to the [c]ourt that it is in the best interest of the [child] that a Guardian of the Person be appointed and that: Casey Jenkins [is] a fit and proper person[] to be so designated.

> IT IS HEREBY ORDERED AND DECREED that: Casey Jenkins be appointed Guardian of the Person of Erik C. Hood with the authority to provide the necessary care and protection pending the filing of a petition pursuant to Tennessee Code Annotated, Section 37-228,[1] and that no bond be required.

This order was signed by the judge and filed on December 11, 2007. Upon its receipt of the order, Old Line notified Sister that the order was inadequate in a letter stating, in pertinent part,

> We received the documents regarding the Guardianship of the Minor beneficiary [Erik] Hood. Unfortunately, the documents received only indicate Guardianship and does not indicate Guardianship for the Finances of the Minor.

> To release the proceeds on this policy, we will need the following:

---

[1]This statute has been repealed.

GUARDIANSHIP PAPERS FOR THE FINANCES OF THE
MINOR BENEFICIARY

Thereafter, Sister filed another petition in the juvenile court, seeking guardianship of Beneficiary's finances. The court complied and issued a second order that provided,

### *APPOINTMENT OF FINANCIAL[2] GUARDIAN OF THE PERSON*

This cause came to be heard upon a sworn petition and IT APPEARING to the [c]ourt that it is in the best interest of the [child] that a Guardian of the Person[']s Financial Responsibilities[3] [be] appointed, and that: Casey Jenkins [is] a fit and proper person[] to be so designated.

IT IS HEREBY ORDERED AND DECREED that: Casey Jenkins [] be appointed Guardian of the Person of Erik Hood Finicial [sic] Responsibilities[4] with the authority to provide the necessary care and protection pending the filing of a petition pursuant to Tennessee Code Annotated, Section 37-228,[5] and that no bond be required.

This order was signed by the judge and filed on January 9, 2008.

Upon receipt of the second order, Old Line submitted a request to the juvenile court, seeking clarification as to whether the second order was valid. The juvenile court responded by submitting a document entitled, Exemplification, which provided that the order was a true and perfect copy of the original appearing in the record, that the clerk's signature was valid, and that the judge's signature was valid. On January 11, 2008, Old Line issued a check to Sister in the amount of $100,854.88. Sister deposited the check into a joint checking account that she shared with Beneficiary. Eight months later, the entirety of the life insurance proceeds deposited into the account was depleted.

On August 31, 2009, Beneficiary filed suit against Sister and Old Line. Relative to Sister, Beneficiary alleged that she had withheld the life insurance proceeds from him, had failed to provide an accounting of the proceeds to him or the juvenile court, and had

---

[2]This word was handwritten.

[3]The term, "Financial Responsibilities" was handwritten.

[4]The term, "Finicial Responsibilities" was handwritten.

[5]This statute has been repealed.

converted and spent most of his money on herself and others. He also alleged that she had acquired other death benefits payable to him. Sister did not respond to the complaint, and the court issued a default judgment against her. Sister did not appeal the default judgment entered against her and is not a party to this appeal.

Relative to Old Line, Beneficiary contended that Old Line breached its duty to him as a third-party beneficiary by disbursing the insurance proceeds to Sister "without confirming that she was properly appointed and duly authorized to act" as his financial guardian. He also contended that Old Line erred by disbursing the proceeds without requiring proof that Sister held duly executed letters of guardianship from the juvenile court. He sought reimbursement of the life insurance proceeds that he was unable to retrieve from Sister. Old Line denied the allegations and claimed that it was entitled to rely on the valid order appointing Sister as Beneficiary's financial guardian; that it acted in good faith in disbursing the proceeds; that any fault apportioned to it should be reduced or eliminated in proportion to the fault of other persons, namely the juvenile court, the clerk, and Sister; and that the injuries and damages were caused by the acts or omissions of other parties. Old Line also filed a motion to dismiss, alleging that it was entitled to rely upon the order issued by the court appointing Sister as Beneficiary's financial guardian.[6] Thereafter, Beneficiary and Old Line filed competing motions for summary judgment. The court denied the motions, finding that there were "disputes of material fact which preclude the granting of either motion for summary judgment."

The case proceeded to a bench trial at which several witnesses testified. Charlotte Swanks, a claims examiner for American General Life Insurance Company,[7] testified that she processed Beneficiary's claim on Father's life insurance policy through Old Line. She stated that after she received the proof of death form and the death certificate, she requested guardianship papers for Beneficiary because the documents indicated that he was a minor. After receiving the first order of guardianship, she consulted her manager because the order did not mention that the purported guardian was to be in charge of the minor's finances. When she requested further documentation concerning the guardianship of Beneficiary's finances, the second order of guardianship was submitted for her review. Upon reviewing the second order, she contacted the juvenile court and asked the court to confirm that the document was valid because portions of the document were handwritten. She stated that in

---

[6]Old Line also filed a cross-complaint against Sister, alleging that it was entitled to reimbursement from Sister for any funds it might be required to submit to Beneficiary. Sister did not respond to the cross-complaint, and the court issued a default judgment against Sister.

[7]Old Line had been purchased by American International Group, Incorporated, a conglomerate of several life insurance companies.

-4-

response to her request, the court faxed her an exemplification. She processed the claim after speaking with her manager a second time and reviewing all of the documents that she had received. She acknowledged that Old Line through American International Group, Incorporated had a legal department staffed with attorneys and admitted that she did not submit the documents that she received concerning Beneficiary's purported financial guardianship to the legal department.

Beneficiary, who was 20 years old at the time of trial, testified that he had graduated from high school, was married, had a child, and was employed. He said that while he currently lived with his grandparents, he moved in with Sister and her family after Father died. Shortly before Father died, he was told about Father's life insurance policy. He filled out the claim for the insurance proceeds and was subsequently advised that the money would be entrusted with a guardian because he was only 16 years old. He said that while he believed he was mature enough to handle the money, he consented to Sister's management of the money as his financial guardian until he was old enough to legally accept responsibility for the money. He asserted that he trusted that the juvenile court would properly appoint Sister and that she would safeguard the life insurance proceeds.

Beneficiary stated that he and Sister opened a joint checking account to deposit the donations that he received when Father died and to deposit his social security payments. He related that Father's friends and family were instructed to provide donations for him instead of sending flowers and that he received a monthly social security check until he turned 18 years old. Originally, he used a debit card to make purchases from the first account, but after he lost the card, he primarily paid for items with checks. He admitted that a second checking account was opened using his name but claimed that he did not know the life insurance proceeds were deposited into the second account. He acknowledged that he had written some checks using the second account but explained that he had mistakenly used a checkbook linked to the second account. He claimed that when he depleted the checks for the first account, he took another checkbook from a stack of checkbooks in a box. He believed that the checks he found in the box were linked to the first account that contained his social security payments but later learned that the checks were linked to the second account containing the life insurance proceeds. He alleged that he never wrote checks in excess of the amount he received each month from social security but admitted that he did not keep a precise accounting of the amount he spent each month.

Beneficiary reviewed the checking account statements for both accounts prior to trial. He asserted that Sister spent most of the money from the second account containing the life insurance proceeds and that she also spent a substantial amount of the money from the first account. He claimed that she used his life insurance proceeds to purchase liquor and various sex enhancement products, to eat at restaurants, to fund massive renovations of Father's

house, and to compensate employees of Jenkins Construction, Sister's family business managed by her husband. He admitted that he gave Sister permission to spend $10,000 of the life insurance proceeds to renovate Father's house with the understanding that he would be reimbursed but asserted that she used in excess of $48,000 for the renovations and that he never received any money in return. He related that he became concerned about his money when he noticed that she had been frequently visiting the hair salon and eating at restaurants on a regular basis. When he became suspicious of her, he asked her if he could see the bank statements. She refused to provide any documentation, and the bank refused to release any information about the accounts to him. He eventually moved out of the house in August 2008. He acknowledged that he did not seek legal advice or contact Old Line prior to moving out and filing his complaint. He admitted that Sister also used some of the insurance proceeds for his benefit and asserted that he only sought reimbursement from Old Line for the amount of money that was not used for his benefit.

Donna Hood, Beneficiary's mother, testified that she consented to Sister's appointment as Beneficiary's guardian and that she was present at the hearing when Sister was appointed.

Sister testified that she was 26 years old when Father died. She related that at the time of Father's death, she worked for Community South Bank in the small business administration department and that she had obtained a degree in accounting. She admitted that she had been arrested three times for passing bad checks.

Relative to Beneficiary, Sister claimed that when Beneficiary moved in with her, he was treated like a member of the family and lived with her family on a full-time basis. She admitted that she used funds from the joint checking accounts to provide for his medical needs and general living expenses. She identified the orders appointing her as Beneficiary's guardian and insisted that she merely signed the documents where she was instructed to sign.

Relative to the two checking accounts, Sister stated that she told Beneficiary that she would need to open a second joint checking account to deposit the insurance proceeds. She claimed that they both received a checkbook and a debit card for each account and that she kept the bank statements for both accounts in the computer desk at the house. She stated that while she used money from both accounts, she also deposited "over $24,000" of her own money into the second account. She related that she spent approximately $46,000 to preserve Father's estate and approximately $17,000 for her own personal items. She explained that some of the money was used to pay the two mortgages on the house, to renovate the house, to preserve Father's business, and to reclaim Father's car that had been repossessed. She believed that her actions would benefit Beneficiary because she was attempting to preserve Father's estate for Beneficiary, who was to receive 90 percent of Father's estate. She

asserted that Beneficiary consented to some of her attempts to preserve the estate but admitted that she never sought guidance from a lawyer regarding her use of the insurance proceeds to preserve the estate. She alleged that while she understood that she was to care for Beneficiary, "[n]othing was ever explained to [her] about the financial part" of the guardianship.

The deposition of Sheena Frost was taken prior to trial and attached as an exhibit. In the deposition, Ms. Frost testified that she worked for Community South Bank in Fall 2007 as a customer service representative. She said that Sister also worked at the bank but that Sister worked in the business lending department. She recalled that Sister and Beneficiary came into the bank together on two separate occasions and signed the appropriate forms to open two joint banking accounts. The first account was opened on September 27, 2007, while the second account was opened on December 18, 2007. She claimed that other than helping Sister and Beneficiary open the accounts, she did not speak with Beneficiary again. She stated that as a named holder on each account, Beneficiary would have been able to write checks, use the debit cards that were assigned to the accounts, and obtain information about the accounts in person or through online banking. She admitted that she did not know whether debit cards were issued for the particular accounts and that only one statement for each account would have been mailed to the address on the account.

Following the arguments of counsel, the court entered judgment against Old Line in the amount of $86,842.37 because Old Line failed to issue the insurance proceeds to someone who had the legal authority to receive the money. In so holding, the court explained that the juvenile court did not have subject matter jurisdiction to appoint a financial guardian. The court continued that even if the juvenile court had subject matter jurisdiction to appoint a financial guardian, the order appointing Sister was deficient. The court noted that letters of guardianship were not issued, that Sister was not required to take an oath of guardianship, and that the bond requirement was not properly waived as required by statute. The court held that while Beneficiary consented to some of the expenditures using the insurance proceeds, Beneficiary did not have the "legal capacity nor authority" to consent to the expenditures because he was a minor. The court stated that if Sister had been properly appointed, the court would not have approved the expenditures to preserve Father's estate because the use of the life insurance proceeds made the proceeds subject to the debts of the estate. The court later acknowledged that it was incorrect in stating that the juvenile court did have subject matter jurisdiction to "grant a guardianship of the property of a minor." The court continued that despite the fact that the juvenile court likely had subject matter jurisdiction, it would not change its ruling that Old Line improperly awarded the life insurance proceeds to Sister. This timely appeal followed.

-7-

## II. ISSUES

We consolidate and restate the issues raised on appeal by Old Line as follows:

A. Whether Sister was properly appointed as Beneficiary's financial guardian.

B. Whether Old Line fulfilled its contractual duty to Beneficiary by submitting the life insurance proceeds to Sister upon its receipt of the order of guardianship from the juvenile court.

C. Whether Beneficiary had the capacity to consent to Sister's receipt of the life insurance proceeds in the absence of a valid appointment of guardianship.

## III. STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

## IV. DISCUSSION

### A.

As a threshold issue, we must address whether the juvenile court's appointment of Sister as Beneficiary's financial guardian was an effective order of financial guardianship. In order for the court's appointment of a guardian to become effective, the court must enter an order of appointment, administer an oath of faithful performance, and accept any required bond. Tenn. Code Ann. § 34-1-109(a). If the guardian is to manage the minor's property, the "faithful performance oath shall include a promise to timely file each required inventory and accounting and to spend the assets of the minor [] only as approved by the court." Tenn. Code Ann. § 34-1-109(b). An order designating a person as financial guardian of a minor must:

(A) Set the amount of the guardian's bond unless waived as authorized in § 34-1-105;

(B) Set forth the nature and frequency of each approved expenditure and prohibit the guardian from making other expenditures without court approval;

(C) Set forth the approved management of the minor's property; and

(D) Prohibit the sale of any property except as permitted by § 34-1-116 without court approval or as permitted in the property management plan approved by such order[.]

Tenn. Code Ann. § 34-2-105. The court is authorized to waive the requirement of a bond if it finds that the requirement of a bond would be unjust or inappropriate *and* that one of the following circumstances exists:

(1) The fiduciary is a financial institution excused from the requirement of bond under § 45-2-1005;

(2) The total fair market value of the minor's [] non-real estate property does not exceed the sum of ten thousand dollars ($10,000) and the court finds the benefit to the ward by saving the expense outweighs the risks incident to the absence of a bond;

(3) The document naming the suggested or preferred fiduciary excuses the fiduciary from posting bond;

(4) The property of the minor [] is placed with a financial institution and the fiduciary and the financial institution enter into a written agreement, filed with the court, in which the financial institution agrees it will not permit the fiduciary to withdraw the principal without court approval;

(5) The property of the minor [] is deposited with the clerk and master or clerk of the court; or

(6) The fiduciary is appointed fiduciary over the person of the minor [] but has not also been appointed as fiduciary over the person's estate.

Tenn. Code Ann. § 34-1-105(b). Additionally, a guardian may not undertake the administration of a minor's estate valued more than $20,000 unless he or she has been issued letters of guardianship. Tenn. Code Ann. § 34-1-104(a).

The order of guardianship in this case is woefully deficient. The order lacked any information regarding the "nature and frequency" of approved expenditures, did not preclude the guardian from making expenditures without court approval, and did not set forth an approved management plan for the insurance proceeds. Tenn. Code Ann. § 34-2-105. Also, the order referenced a repealed statute and did not contain *any* reasoning regarding the waiver of the bond requirement. The record before this court is devoid of any proof that the court even administered an oath of faithful performance. Additionally, Sister did not possess letters of guardianship. In consideration of the aforementioned deficiencies, we conclude that the order before this court was not an effective order of guardianship. Accordingly, we also conclude that Sister was not properly appointed as Beneficiary's guardian of his estate.

B.

Old Line argues that it complied with its contractual obligations under the life insurance policy by paying the face amount of the policy to Sister. Old Line contends that it was entitled to rely on a facially valid court order appointing Sister when the court issuing the order had subject matter jurisdiction. Old Line notes that the life insurance policy did not even specify that the proceeds would be delivered to a guardian if the beneficiary was a minor. In the alternative, Old Line argues that regardless of its alleged breach of the contract, it was not the proximate cause of Beneficiary's injury. Beneficiary responds that Old Line failed to comply with state law by issuing the life insurance proceeds to Sister, who did not possess valid letters of guardianship.

"'Insurance contracts are subject to much the same rules of enforcement and construction which apply to contracts generally.'" *Gray v. Estate of Gray*, 993 S.W.2d 59, 64 (Tenn. Ct. App. 1998) (quoting *Draper v. Great Am. Ins. Co.*, 458 S.W.2d 428, 432 (Tenn. 1970)). The cardinal rule of contract interpretation is that the court "must attempt to ascertain and give effect to the intent of the parties." *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005). In attempting to ascertain the intent of the parties, the court must examine the language of the contract, giving each word its usual, natural, and ordinary meaning. *See Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996). The "court's initial task in construing a contract is to determine whether the language of the contract is ambiguous." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). Where the language of a contract is clear and unambiguous, its literal meaning controls the outcome of the dispute. *Id.* at 890. "The trial judge is required, if the contract is ambiguous, to determine the intention of the parties not alone from the language of the

-10-

contract but also from the surrounding facts and circumstances." *HMF Trust v. Bankers Trust Co.*, 827 S.W.2d 296, 299 (Tenn. Ct. App. 1991) (citing *Nat'l Garage Co. v. George H. McFadden & Bro., Inc.*, 542 S.W.2d 371 (Tenn. Ct. App. 1975)).

The contract at issue in this case is silent as to how insurance proceeds are to be distributed to a minor beneficiary; however, the contract provided, "Due proof of the insured's death will consist minimally of our company claim form completed by the beneficiary and a certified copy of the death certificate of the insured." Relative to minor beneficiaries, the special instructions to the company claim form provided,

> **Minor Beneficiary.** The Statement is to be completed by the *legally appointed guardian of the Estate of the minor* and an official certificate of the guardian's appointment *must* be furnished.

(Emphasis added). Thus, in order for a minor beneficiary to recoup life insurance proceeds from Old Line, the minor must have been represented by a legally appointed guardian of the minor's estate. Indeed, Ms. Swanks sought documentation concerning the appointment of Sister as Beneficiary's purported financial guardian and would not release the life insurance proceeds until she received a court order. Sister was simply not the legally appointed financial guardian of Beneficiary.

Nevertheless, this court has held that an insurance company that has submitted payment to the wrong party in violation of its contract may forego re-payment to the correct party when the initial payment is made in good faith. *See Snow-Koledoye v. Horace Mann Ins. Co.*, No. M2000-02954-COA-R3-CV, 2002 WL 225893, at *6 (Tenn. Ct. App. Feb. 14, 2002); *Atkins v. Sec. Connecticut Life Ins. Co.*, No. 02A01-9710-CV-00257, 1998 WL 900057, at *2 (Tenn. Ct. App. Dec. 28, 1998). However, "[a]n insurer is required to investigate a claim when the company is aware of suspicious circumstances." *Atkins*, 1998 WL 900057, at *2 (citations omitted). Upon the receipt of the second order, Old Line was put on notice that the order of guardianship was ineffective for purposes of awarding the life insurance proceeds to Sister as Beneficiary's financial guardian. *Id.* The order appeared to be a replica, with minor handwritten and misspelled changes, of the original order that Ms. Swanks rejected as insufficient. Instead of determining what was required to establish a legal guardianship of a minor's finances, Ms. Swanks simply confirmed that the order had been drafted by the juvenile court and then paid the claim after consulting with her manager. We agree that the order of guardianship was a facially valid court order that was signed by the juvenile court judge. However, the order did not effectively establish Sister as Beneficiary's legally appointed guardian of his estate. At most, the order simply established Sister as a guardian over Beneficiary's person. *See* Tenn. Code Ann. § 34-2-105 (listing the elements of an order establishing a fiduciary as the financial guardian of a minor). A reasonably

prudent investigation would have revealed that the order was ineffective for purposes of establishing Sister as Beneficiary's legally appointed *financial* guardian. *Atkins*, 1998 WL 900057, at *3. Thus, we reject Old Line's assertion that its payment to Sister was made in good faith because it relied on the court order purportedly establishing Sister as Beneficiary's financial guardian.

We also reject Old Line's argument that it was not the proximate cause of Beneficiary's injury, namely Sister's misappropriation of the insurance proceeds. Quoting *Anderson-Gregory Co., Inc. v. Lea*, 370 S.W.2d 934 (Tenn. Ct. App. 1963), Old Line states that a defendant is not liable for damages in an action for breach of contract unless such damages are the "natural and proximate consequences" of the breach. We hold that it was reasonably foreseeable that entrusting a large sum of money with someone who had not been briefed on the "nature and frequency" of approved expenditures, was not precluded from making expenditures without court approval, and had not been given an approved management plan would result in the misappropriation of the life insurance proceeds to Beneficiary's detriment. *See* Tenn. Code Ann. § 34-2-105. Thus, Beneficiary's injury was a natural and proximate consequence of Old Line's failure to ensure that the life insurance proceeds were safeguarded with a legally appointed financial guardian. Accordingly, we conclude that the trial court did not err in awarding judgment against Old Line because Old Line violated its contractual obligations by submitting the life insurance proceeds to Sister, who was not Beneficiary's legally appointed guardian.

C.

Old Line asserts that regardless of whether the guardianship statutes were complied with, Beneficiary consented to the improper distribution of the life insurance proceeds to Sister. Citing *Cardwell v. Bechtol*, 724 S.W.2d 739 (Tenn. 1987), Old Line argues that Beneficiary had the capacity to consent to Sister's improper receipt of the life insurance proceeds. Old Line notes that Beneficiary knew that Sister had received and deposited the check and that he also regularly used the checking account containing the life insurance proceeds. Beneficiary responds that he did not possess the legal capacity to consent to Sister's misappropriation of the life insurance proceeds and that he did not know that he had access to the life insurance proceeds.

In *Cardwell*, the Supreme Court adopted the mature minor exception to the common law rule that parental consent was required for medical treatment. 724 S.W.2d at 748-49. The exception was adopted with the instruction that its application was a "question of fact for the jury to determine whether the minor ha[d] the capacity to consent to and appreciate the nature, the risks, and the consequences of the medical treatment involved." *Id.* at 749. In addition to the court's adoption of the mature minor exception in limited circumstances,

-12-

the legislature "recognized that persons under the age of [18] may have the capacity to make significant and important decisions and to engage in activities that were traditionally viewed as adult activities."  *Seals v. H & F, Inc.*, 301 S.W.3d 237, 259 (Tenn. 2010) (Koch, J., concurring in part and dissenting in part).  The activities recognized by the legislature included working part-time, obtaining a learner's permit, leasing a safety deposit box, marrying at the age of 16, obtaining contraceptive advice and supplies, consenting to prenatal care, seeking judicial consent for an abortion, and surrendering a child for adoption.  *Id.* (citations omitted).

The statutory and court-approved extensions of a minor's capacity to consent to certain activities are distinguishable from the present case.  The guardianship statutes at issue protect minors and ensure that property and funds left to a minor are properly safeguarded by a legally appointed guardian until the minor attains the age of majority.  Tenn. Code Ann. § 34-2-106(b)(1).  Once the minor attains the age of majority, the guardianship terminates automatically unless a petition to continue the guardianship is filed.  Tenn. Code Ann. § 34-2-106(b).  If a petition to continue the guardianship has been filed, the court must consider whether termination of the guardianship is in the person's best interest and whether the person has attained the ability to "wisely manage and control the property."  Tenn. Code Ann. § 34-2-106(b)(3).  Implicit in the guardianship statutes is the presumption that a minor is unable to wisely manage and control the property he or she has been given.  To hold that a minor is capable of consenting to the improper appointment of a financial guardian who is tasked with wisely managing and controlling the property at issue would render the guardianship statutes obsolete.  Accordingly, we hold that Beneficiary lacked the capacity to consent to the improper appointment of Sister as his financial guardian and her subsequent misappropriation of the insurance proceeds.

## V.  CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary.  Costs of the appeal are taxed to the appellant, Old Line Life Insurance Company of America.


_____
JOHN W. McCLARTY, JUDGE

-13-